763 A.2d 753 (2000)
Conor VELAZQUEZ, an infant by his mother and natural guardian, Charmaine VELAZQUEZ, Charmaine Velazquez, individually and as Administratrix of the Estate of Conor Velazquez; and Jose Velazquez, individually and as Administrator of the Estate of Conor Velazquez, Plaintiffs-Appellants-Cross-Respondents,
v.
Teresa JIMINEZ, M.D., St. Peter's Medical Center, Maureen Cernadas, M.D., Scott Siegel, M.D., Carlos Benito, M.D., Melissa Ackerman, M.D., Ellen Maak, R.N., Mary Ellen Hanley, M.D., and Jeanene Healy, R.N., Defendants,
and
Angela Ranzini, M.D., Defendant-Respondent-Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2000.
Decided December 19, 2000.
*754 *755 James M. Andrews, Roseland, argued the cause for appellants-cross-respondents (Blank Rome Comisky & McCauley, attorneys; Mr. Andrews, Joel Glucksman, and Lindsey H. Taylor, on the brief).
Cynthia A. Walters argued the cause for respondent-cross-appellant (Budd Larner Gross Rosenbaum Greenberg & Sade, attorneys; Ms. Walters, of counsel and on the brief; Donald P. Jacobs, Summit, and Bruce D. Vargo, Roseland, also on the brief).
Before Judges PETRELLA, NEWMAN and BRAITHWAITE.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Conor Velazquez (now deceased) and his parents, Charmaine and Jose Velazquez, individually and in representative capacities (plaintiffs) appeal from the entry of judgment n.o.v. sua sponte by the trial judge. A jury trial against Dr. Angela Ranzini, the only remaining defendant,[1] resulted in a verdict in favor of plaintiffs and a finding that Dr. Ranzini was 3% negligent.
Plaintiffs contend that the judge erred in sua sponte entering a judgment for defendant Dr. Ranzini n.o.v. and erred in giving the jury a proximate cause instruction which allowed the jury to find a preexisting condition. Plaintiffs further contend that there was error in: failing to play back certain testimony to the jury and incorrectly answering one of the jury's questions regarding this testimony; excluding from evidence videotapes of a day in the life of Conor; and allowing Dr. Ranzini's expert to testify beyond the *756 scope of his report. Dr. Ranzini[2] cross-appeals from a ruling by the trial judge that the Good Samaritan Act (N.J.S.A. 2A:62A-1 to 3) (the Act) did not immunize her from liability.
We agree with plaintiffs that the judge erred in setting aside the jury verdict. Hence, we reverse the judgment n.o.v. As to all other issues raised by plaintiffs we find no reversible error. The claim on the cross-appeal is rejected.
Plaintiffs' original complaint was filed July 26, 1994, against defendants Teresa Jiminez, M.D.; St. Peter's Medical Center (Medical Center); Angela Ranzini, M.D.; Maureen Cernadas, M.D.; Scott Siegel, M.D.; Carlos Benito, M.D.; Melissa Ackerman, M.D.; and Ellen Maak, R .N. The first count alleged that Charmaine Velazquez received negligent obstetrical care from Drs. Jiminez, Ranzini, Cernadas, Ackerman, and Benito; negligent nursing care from Maak; and negligent anesthesiology care from Dr. Siegel at the Medical Center. It also alleged that the Medical Center, as the employer, was responsible for the negligence of all codefendants and that it negligently promulgated inaccurate regulations or criteria. Count two alleged that Charmaine and Jose Velazquez suffered emotional distress from being present while their son, Conor, was injured by the negligence of the defendants. There was no count three, but a count four alleged that Charmaine suffered laceration of the left uterine artery and loss of blood and sought damages.
On February 10, 1995, plaintiffs filed an amended complaint, naming Mary Ellen Hanley, M.D., as an additional defendant, and adding count three, which sought damages for the loss of Conor's services. On April 4, 1995, plaintiffs filed a second amended complaint naming Dr. Jiminez's medical group as a defendant.
Plaintiffs entered voluntary stipulations of dismissal with prejudice against Drs. Siegel, Ackerman, Benito, Cernadas, and Hanley. On April 2, 1996, plaintiffs settled with Dr. Jiminez for $1,010,000.
On May 9, 1996, plaintiffs filed a third amended complaint adding Jeanene Healy, R.N., as a defendant. After Conor's death, plaintiffs filed a fourth amended complaint adding a count five for wrongful death.
Dr. Ranzini moved for summary judgment on the ground that she was immune from suit under the Good Samaritan Act, N.J.S.A. 2A:62A-1 to -3. The judge denied the motion, reasoning that the Good Samaritan Act was inapplicable to physicians who respond to an emergency within a hospital. We denied Dr. Ranzini's motion for leave to appeal.
On March 11 and 12, 1998, the judge heard argument on various pretrial motions filed by plaintiffs and defendant. Among other rulings, the judge decided that (1) plaintiffs were precluded from showing videotapes of Conor to the jury at trial; and (2) Dr. Ranzini was barred from referring to herself as a "Good Samaritan" or "volunteer." Plaintiffs settled with the Medical Center for $35,000 and voluntarily dismissed the claims against nurses Maak and Healy before trial.
The matter was tried to a jury between March 24 and April 7, 1998. On the second day of jury deliberations, a different judge substituted for the trial judge, who had a doctor's appointment. In response to special interrogatories, the jury found that Dr. Ranzini was negligent and fixed percentages of fault. The jury determined that the ultimate injury resulted from (a) a preexisting condition (5%); (b) Dr. Jiminez's negligence (92%); and (c) Dr. Ranzini's negligence (3%). The jury also determined that plaintiffs suffered $1 million in damages from the wrongful death of Conor; Charmaine Velazquez suffered $1 million in damages for her emotional distress; *757 and Conor suffered $500,000 in damages for pain and suffering.
On May 15, 1998, the judge, sua sponte, ruled that Dr. Ranzini was not negligent as a matter of law and set aside the jury's verdict against her. Plaintiffs appealed and Dr. Ranzini cross-appealed.

I.
The following facts were developed at the trial. Dr. Jiminez had been Charmaine Velazquez's obstetrician since 1987. She delivered Charmaine's oldest child, Conrad, and provided prenatal care during her pregnancy with Conor. Charmaine had high blood pressure throughout her pregnancy with Conor. Additionally, one of Charmaine's glucose tolerance readings was abnormal, but a retest was normal. An abnormal glucose reading can indicate gestational diabetes, which may lead to an abnormally large baby. During the last six weeks of her pregnancy, Charmaine had difficulty walking and realized that Conor was large, and quit her job. When Charmaine mentioned her concerns to Dr. Jiminez, she dismissed them by stating "it was a lot of fat and fluid."
Around 6:00 p.m. on February 9, 1994, Charmaine became concerned because she could not feel Conor moving and called Dr. Jiminez, who told her to go to the Medical Center. A sonogram showed that Conor's heart rate was normal and that he was sucking, swallowing, and kicking. However, the Medical Center resident expressed concern to Charmaine that Conor was "not active enough." It was decided that Charmaine would stay in the hospital that night to see if she would go into labor. A gel was applied to her cervix to stimulate contractions.
The next morning, Dr. Jiminez examined Charmaine and looked at the fetal heart beat strips. Dr. Jiminez told Charmaine that the baby's heart rate looked strong and that if she did not go into labor soon, she would induce labor. That evening, Dr. Jiminez prescribed Pitocin, a labor-inducing drug. At 9:00 p.m., Dr. Jiminez ruptured plaintiff's membrane. About 11:00 p.m. the baby's heart rate was 150 beats per minute. Throughout that night, the baby's heartbeat showed minimal variability. According to Maak, minimal variability of heartbeat can indicate a compromised baby. Around 1:50 a.m., the baby's heartbeat dropped to an average of 120 beats per minute. When Charmaine was dilated nine centimeters, the nurses told her to begin pushing. Dr. Jiminez then came into the delivery room. Charmaine began to push, but only with great difficulty. At 2:49 a.m., Dr. Jiminez announced that the head had been delivered and urged Charmaine to keep pushing. According to Maak, who was assisting during the delivery, after the head was delivered, she saw that the umbilical cord was loosely wrapped around the baby's neck. Dr. Jiminez flipped the cord over the head so that it was no longer around the baby's neck.
After the head was delivered, the baby was unable to move any further because his shoulders were jammed against plaintiff's pubic bone, a condition called shoulder dystocia and that Dr. Ranzini described as one of the most serious problems in a vaginal delivery. In shoulder dystocia the baby's head has emerged and the baby is trying to breathe, but the baby's body is still in the birth canal because its bony shoulder is hung up inside the bony pelvis of the mother. Unless the baby is delivered quickly he will asphyxiate. Once the baby's head is delivered, its circulation begins to switch from fetal circulation, where the blood is coming through the umbilical cord, to respiratory circulation, where the baby is trying to breathe on its own. If the baby cannot breathe, it will become hypoxic.[3] Even if the head is put back in, the baby may become hypoxic.
*758 When confronted with shoulder dystocia the delivering physician normally attempts a number of standard maneuvers. The nurses and Dr. Jiminez tried several maneuvers to deliver the baby, including the McRoberts maneuver where the doctor flexes the mother's legs back on her chest to open up the pelvis and create a larger area for the baby's shoulders to pass through. Supra pubic pressure was used. Downward pressure was exerted on Charmaine's abdomen to try and help release the shoulder. Maak noted on the chart that fundal pressure was applied around this same time. Fundal pressure is applied at the top of the mother's stomach.
Before 3:00 a.m., Dr. Jiminez called for assistance. Dr. Jiminez testified that this was the worst shoulder dystocia she had ever seen. Dr. Ranzini, who was then at the nursing station checking fetal heart rate monitors, responded. Dr. Ranzini had come on duty on February 10, 1994, at 5 p.m. She had no prior knowledge of Charmaine or her baby. Dr. Ranzini was trained in obstetrics and gynecology with a specialty in maternal fetal medicine, which concerns the care of pregnant women or women who wish to become pregnant who have major medical problems. This specialty also deals with diagnosing fetuses with problems and trying to optimize the outcome for both mother and baby.
In the delivery room Dr. Ranzini saw that Dr. Jiminez was attempting to deliver the baby vaginally. Dr. Jiminez told Dr. Ranzini that she had in place the McRoberts maneuver and had applied supra pubic pressure. Dr. Ranzini observed Dr. Jiminez unsuccessfully try a number of maneuvers. Then, Dr. Jiminez told Dr. Ranzini that she had tried everything and could not get the baby delivered and asked Dr. Ranzini to try. Dr. Ranzini tried to move the baby's shoulder into a different position (the Woods maneuver), but could not reach the shoulder because it was too high. While performing this maneuver, Dr. Ranzini concluded that this was a bilateral shoulder dystocia in that both of the baby's shoulders were stuck on the mother's pubic bone. In a bilateral shoulder dystocia, the baby's neck is "stretched way beyond where it would ordinarily go." This was the first bilateral shoulder dystocia that Dr. Ranzini had handled.
Once Dr. Ranzini realized that this was bilateral shoulder dystocia, she announced that the baby could not be delivered vaginally and that she was going to put the head back (the Zavanelli maneuver) so that an emergency cesarean section ("C-section") could be performed immediately. As Dr. Ranzini pushed, the head recoiled into the uterus or high into the vagina and drenching her with a gush of amniotic fluid which caused her to step backwards.
Dr. Ranzini had handled between ten to fifty cases of shoulder dystocia before 1994. In all these previous deliveries, she was able to deliver the baby vaginally and without using a Zavanelli maneuver. The Medical Center protocols for shoulder dystocia call for the use of cephalic replacement, also called the Zavanelli maneuver, if the other maneuvers fail.
After the Zavanelli maneuver, performed at 2:55 a.m., Dr. Jiminez examined Charmaine internally and announced that there was a cord prolapse. Dr. Ranzini did not observe the cord prolapse. Dr. Jiminez, her hand inside Charmaine's vagina, attempted to hold the baby's head up off the umbilical cord so that it was not pinched off. Dr. Jiminez could feel the cord pulsating, so she knew that she was successfully managing it.
Dr. Ranzini and the nurses disconnected Charmaine's bed and the fetal monitors and moved the bed very quickly to the operating room with Dr. Jiminez riding on the bed while holding the baby's head off the umbilical cord. Dr. Jiminez estimated that it took approximately six to nine minutes to travel from the delivery room to the operating room. The chart showed that a total of four minutes elapsed from the time of the Zavanelli maneuver until Charmaine was in the operating room.
*759 In the operating room Dr. Ranzini observed that there was no other doctor to assist in performing the emergency C-section. Both Dr. Ranzini and Dr. Jiminez anticipated that Dr. Ranzini would perform the C-section while Dr. Jiminez continued to hold up the baby's head. According to Dr. Ranzini, she told Dr. Jiminez, who was still holding the baby's head off the cord, that she would get Dr. Carlos Benito, a fourth year resident, to assist in the surgery. Dr. Ranzini explained at trial that a C-section was always performed with two doctors. When Maak no longer saw Dr. Ranzini in the operating room she believed Dr. Ranzini had gone to find an assistant.
Dr. Jiminez testified that when she got to the operating room, she was surprised that Dr. Ranzini was not there. Because no other doctor was then available to perform the C-section, Dr. Jiminez removed her hand from Charmaine's vagina and began to prepare to operate. Dr. Jiminez conceded that she learned from one of the nurses that Dr. Ranzini had run next door to get a resident to assist with the C-section. Once Dr. Jiminez removed her hand, she was uncertain whether the baby's head had again compressed the cord. However, she also testified that she could no longer feel the cord prolapse and thought that it had replaced itself. Dr. Jiminez said if she had believed that the cord was still prolapsed, she would have asked one of the nurses to manage it.
Nurse Healy, who also assisted, testified that she asked Dr. Jiminez "Where's the cord?" and Dr. Jiminez said "Don't worry I put it back." Maak also saw Dr. Jiminez standing next to Charmaine preparing to do the C-section, but did not hear Dr. Jiminez say anything.
Meanwhile, at about 3:00 a.m., Dr. Ranzini ran to a neighboring operating room to get Dr. Benito. On her way back Dr. Ranzini stopped to scrub at the scrub sink and looked into the operating room where she saw that Dr. Jiminez had taken her hand out of Charmaine's vagina. Dr. Ranzini stopped scrubbing and went into the operating room, asking "what happened to the cord?" Dr. Jiminez replied, "don't worry about the cord prolapse, it's been fixed." After the C-section, Dr. Ranzini asked Dr. Jiminez if Charmaine had been at risk for shoulder dystocia and Dr. Jiminez told her no.
Conor was delivered at 3:07 a.m., February 11, 1994. At birth he showed no heart rate, no signs of respiration, no movement, and was blue as a result of acute profound asphyxia. His Apgar score, which measures a baby's health at birth, was zero out of a possible ten. Conor was aggressively resuscitated and after eight minutes the doctors were able to restore his heartbeat. At this time he had an Apgar score of only three.
Dr. Susan Shen-Schwartz, a staff pediatric pathologist, examined the placenta and umbilical cord after Conor's birth. Shen-Schwartz described the cord as "diffusely hemorrhagic with engorged vessels." She did not believe her observations of this cord were consistent with a compressed cord. The placenta was an abnormal color, gray/white, instead of the normal blue/ gray. The chorionic vessels in the placenta were collapsed, which is abnormal and may be a feature of vasospasm, the constriction of the blood vessels in the umbilical cord.
Conor was in a coma and in critical condition after his birth. His birth weight was ten pounds, five or six ounces. He came out of the coma two or three days after his birth and the neonatologists told Charmaine that Conor had suffered acute asphyxiation. Another doctor said that Conor was severely brain damaged, had severe cerebral palsy, would never walk or possibly talk, and would need constant care. Conor had no suck or swallow reflex and needed to be suctioned through his nose and mouth every three to five minutes. He also needed medication to control his seizures, a nasal tube to maintain an adequate oxygen level, and a feeding *760 tube. Conor died on January 5, 1997, with the cause of death listed as pneumonia.
Plaintiffs presented the videotaped testimony of Dr. Bernard Nathanson, an expert in obstetrics, who called the fetus's lack of movement on February 9, 1994, a "very ominous turn of events." He said that babies at or near term who stop moving are generally compromised and less able to cope with hypoxia (a reduction of oxygen to the fetal tissue).
Nathanson noted that when Charmaine was first admitted to the Medical Center, she was given a biophysical profile test to assess the health of the fetus and scored four points out of a possible ten, which "is to be interpreted as probable asphyxia." He said this test "should have been repeated in an hour or two thereafter, because this is right on the borderline of exhaustion of the fetal reserves and fetal decompensation." He opined that Dr. Jiminez's failure to consult with a high-risk perinatalogist after receiving these test results was a deviation from the standard of care. At this point Dr. Jiminez should have delivered the baby by C-section instead of inducing labor because the baby was beginning to be asphyxiated. According to Nathanson, when Dr. Jiminez checked the fetal heart monitor the next morning and found that there was no variability in the heart rate, this was an ominous finding indicating possible fetal brain damage from hypoxia.
Because later that day the baby's head was progressing more slowly than normal Nathanson felt this indicated obstructed labor and Dr. Jiminez should have ordered a C-section at that point. He said that the fact that Charmaine's amniotic fluid was clear at 8:55 p.m. when Dr. Jiminez ruptured the membrane was "relatively reassuring," but did not rule out asphyxia. The heart fetal monitoring strips from around this time were "unremarkable" and did not really indicate anything about the baby's status.
In Nathanson's opinion, Dr. Jiminez's requests for the nurses to apply fundal pressure to Charmaine before and after delivery of the head was a deviation from accepted standards of medical care. Fundal pressure is applied to the top of the mother's uterus in an effort to push the baby out of the birth canal. Before the head is delivered, fundal pressure has the potential to inflict injury on the fetus's head. In the case of shoulder dystocia, fundal pressure makes matters worse because it pushes the baby's shoulder into the mother's pubic bone.
Nathanson testified that Dr. Ranzini deviated from accepted standards of medical care by failing to check for a cord prolapse immediately after the Zavanelli maneuver. In his view, Dr. Ranzini also deviated from the accepted standard of care when she left the operating room to find a resident to assist her, rather than performing a C-section while Dr. Jiminez managed the cord prolapse. He considered it a serious deviation from the standard of care for Dr. Ranzini to fail to manage the cord prolapse after she returned to the operating room and discovered that Dr. Jiminez was no longer managing it.
According to Nathanson, Conor was a macrosomic (abnormally large) baby. Nathanson also said that Charmaine's abnormally large fundal (a portion of the uterus) height during her pregnancy should have indicated to Dr. Jiminez that the fetus was macrosomic. Obese women such as Charmaine, who weighed 241 pounds when she became pregnant, are at greater risk of having a macrosomic baby due to gestational diabetes. Charmaine was screened for diabetes in November and the test showed abnormally elevated levels. A week later the test was repeated and revealed one abnormal value. In Nathanson's opinion, Dr. Jiminez deviated from accepted standards in failing to give the test a third time because Charmaine probably had gestational diabetes.
Dr. John J. Shane, a pathologist, testified for plaintiffs and reviewed Dr. Shen-Schwartz's report on the placenta and umbilical *761 cord. His report said that the cord was diffusely hemorrhagicthat isthe cord contained red blood cells which had escaped from the veins which ran through it. His report also noted that the blood vessels in the cord were engorged, meaning that they were distended and dilated with blood. Moderate deposits of fibrin in the sub-chorionic plate were also noted. Shane opined that the hemorrhagic cord and engorged vessels were caused by cord compression. The diffuse hemorrhagic change of the cord was the result of hypoxia (reduction of oxygen to the baby). In addition, the vascular engorgement implied cord compression that did not allow the blood to circulate. Moderate deposits of fibrin in the chorionic plate indicated hypoxia. The abnormalities found in the cord and placenta were in his opinion from acute changes occurring close in time to the C-section.
Shane stated that Shen-Schwartz's observation that the cord was not flattened was consistent with his conclusion that there had been cord compression because the cord is a shock absorber and it might be flattened during compression, but when the pressure was relieved, it sprang back to normal size. Shane further opined that to produce the type of hemorrhage seen in the cord, it would have to be compressed for five to ten minutes.
Plaintiffs also called Dr. George Peckhan, an expert in pediatrics and neonatology, who testified as to the cause of Conor's brain damage and cerebral palsy. Peckhan opined that Dr. Ranzini's performance of the Zavanelli maneuver led to the cord prolapse because when Conor's head emerged, the cord was around his neck and remained in the vagina and was trapped and compressed by the baby's head.
Peckhan opined that Dr. Ranzini's failure immediately after the Zavanelli maneuver to check for cord prolapse proximately damaged Conor. Compression of the cord reduced blood flow and oxygen to Conor's brain and prevented removal of the baby's waste products, such as the carbon dioxide from the baby's breathing. The obstruction of carbon dioxide leaving the baby can cause damage within minutes.
Peckhan stated that once Dr. Jiminez took her hand out of Charmaine's vagina it was impossible for the umbilical cord to retract into the womb. He estimated from his experience and the results of Conor's cord blood gas studies, that Conor had acute profound asphyxia at birth because he had been deprived of oxygen for approximately fifteen to twenty minutes. In his opinion Dr. Jiminez's removal of her hand from Charmaine's vagina to perform the C-section contributed to Conor's brain damage. However, Dr. Jiminez had no option but to begin to scrub for the operation. Dr. Ranzini's failure to manage the cord after she came back into the operating room proximately caused damage to Conor. Also, Peckhan felt that Dr. Jiminez's failure to do a C-section immediately upon Charmaine's admission to the hospital was not the proximate cause of damage to Conor. Rather, the damage was "very specific and very close to the time of his delivery at 3:07 a.m." He said he saw no evidence of ongoing damage to Conor before that time. Peckhan did not believe that the use of Pitocin (a drug used to cause contractions in the mother) at 6:00 p.m. proximately caused the damage to Conor. Nor did he believe that the fundal pressure that was applied proximately caused the damage.
Peckhan admitted that in an earlier report (April 13, 1995) in which he listed the causes of Conor's injuries, he did not mention Dr. Ranzini's actions as a cause. Rather, in that report, he attributed the damage to Conor to the actions of Dr. Jiminez, including, failure to recognize the lack of fetal movement; failure to examine Charmaine for fourteen hours after admission to the hospital; failure to refer her to the High Risk Maternal Fetal Division when she was admitted to the Medical Center; failure to recognize that her labor *762 was dysfunctional; negligence in the administration of Pitocin because in the case of shoulder dystocia, the contractions force the baby's shoulders into the mother's pelvis; and application of fundal pressure which may compress the umbilical cord and compromise fetal circulation. This earlier report stated that if Charmaine had been referred to the high-risk division, she would not have undergone a vaginal delivery. It was not until nine months later, when Peckhan wrote a second report dated January 18, 1996, that he focused on Dr. Ranzini.
Dr. Michael Kreitzer, an expert in obstetrics, testified for Dr. Ranzini and opined that she did not deviate from medical standards in her care of Charmaine. He emphasized that Dr. Ranzini did "a remarkable job under the circumstances." Shoulder dystocia is an emergency that can lead to injury and even death to the baby and mother. He explained that if the head is delivered the baby will try to breathe, but it cannot move air inside its lungs because they are still within the mother's abdomen. Absent prompt delivery the baby would die.
Kreitzer also stated that Dr. Ranzini did not violate the standard of care when she failed to check for cord prolapse after the Zavanelli maneuver. As a result of the Zavanelli maneuver, Dr. Ranzini was drenched with a gush of amniotic fluid. He considered it a normal response for Dr. Ranzini to momentarily step back, and at this point, it was appropriate for her to allow Dr. Jiminez to step in and check the cord.
Neither did Kreitzer believe that Dr. Ranzini violated the standard of care by running to get Dr. Benito to assist in the C-section. He said that procedure required at least two people and he considered the short time between the Zavanelli maneuver and the C-section as "remarkable."
Kreitzer also opined that it was not a deviation from the standard of care for Dr. Ranzini not to try to manage the cord in the operating room after Dr. Jiminez told her that she had replaced it because if the cord had been replaced successfully then there was no need to try to keep the baby's head from compressing it. In Kreitzer's opinion, Dr. Ranzini's presence at the delivery contributed to the baby being born alive, rather than dead.
In responses to special interrogatories, the jury found that Dr. Ranzini was negligent for not "checking or managing the condition of the cord immediately after the Zavenelli maneuver in the labor and delivery room." However, the jury found that Dr. Ranzini was not negligent for not "checking or managing the cord after reentering the operating room."

II.
Plaintiffs assert that the judge erred in sua sponte entering judgment for Dr. Ranzini n.o.v. They argue that the judgment for Dr. Ranzini was in error because the judge entered it based on a mistaken understanding of the record and the law of substantial factor. Plaintiffs also argue that the judge's action was flawed procedurally because judgment was entered for Dr. Ranzini without giving them notice or the opportunity to be heard.
The parties appeared before the trial judge on May 15, 1998, on Dr. Ranzini's motion to mold the jury verdict by (1) issuing a credit for plaintiffs' settlement with the Medical Center and (2) striking the jury's award on plaintiffs' emotional distress claim. Before hearing argument the judge announced that he had decided to dismiss the case against Dr. Ranzini, notwithstanding the jury's verdict: "I'm strongly of the opinion that the plaintiff's claim against Dr. Ranzini should be dismissed as a matter of law." The judge ruled without having the benefit of briefs. His reasoning was:
I felt that the award here wasreflected it to some extent in the three percent that was imposed againstwas it three percent against Dr. Ranzini? *763 Ms. Walters [Ranzini's attorney]: Yes it was, Your Honor.
The Court: And that I would have a lot of difficulty under Scafidi which talks about substantial factor to say that three percent is a substantial factor. I felt that the case against Dr. Ranzini should fall before it was handed to the jury.... [M]y perception was almost as a matter of law that the original doctor, whose name isI forgotwhat was her name?
Mr. Andrews [plaintiffs' attorney]: Jiminez, Your Honor.
The Court: Jiminez, was totally responsible for what happened. I don't remotely agree with Ms. Walters' thought about the goodgood samaritan doctrine. While I was intrigued by it I don't remotely think that it applies. However the doctrine of an emergent situation and somebody coming on the scene and not being expected to exercise all of the things that a rescuer ordinarily would do probably was implicating my or affecting my thinking.

* * *
I felt all along that this was just brilliant lawyering which imposed a standard of legalese upon a medical department in the throes of a terrible emergent situation and that the ability to extrapolate from that a cause of action was superbly done. But in cold hindsight that type of formal legaleseif I now hand the patient over to you, Dr. Ranzini saying to Dr. Jiminez when she was sprayed with amniotic fluid containing meconium, I think that in real life, first of all, she's now no longer surgically correct, I think she had every right to leave thethe whatever it was, labor and delivery or the surgery room, andso that she could make herself presentablepresentable to get back into the surgery room. She was obviously infected at that stage with meconium stained amniotic fluid. And I think that I am inclined to dismiss sua sponte, because I don't know if you made a motiondid you make a motion, Ms. Walters, at the end of this case?
Ms. Walters: No, Your Honor.
The Court: Okay, I am inclined to dismiss sua sponte the claim against Dr. Ranzini as a matter of law on my own.

* * *
The Court: ... But I sua sponte dismiss this case. I'm not sure I'm using the right words. What happened here is Dr. Ranzini came on in an emergent situation, attempted to help a baby that washad shoulder [dystocia], right? Both at the coccyx and at the pubic ramus, if I recall correctly? Really locked in there.

* * *
The Court: Performed a [Zavanelli] maneuver at which case [sic] she was sprayed with amniotic fluid which was infected by meconium. I'm not so sure that was in the case but I knowI take it as a matter of law that my recollection is that it was meconium stained fluid and I think she was infected. She thereafter left or abandoned this particular patient and the rest is history. I, as a matter of law, find that she was notsua sponte find that she was not negligent under these circumstances and I dismiss the case against her.

* * *
Mr. Andrews: ... When she was sprayed with the amniotic fluid there wasthe evidence was that it was clear, there was no meconium at that point.
The Court: But wasn't there meconium stain beforemaybe I'm confusing this but I thought there was fetal distress, the reason for the C-section was because the baby was having problemsbelieve me, I've tried so many of these cases I just get confused as to
... as to the facts and I really can't recall. But I thought there was meconium stained fluid. And if there wasn't she was still sprayed with amniotic fluid and as far as I'm concerned that's bad *764 enough surgically to have herself cleaned up. And I don't think that the formal dance of handing off tofrom one doctor to another or one doctor stating to the other, I now take over the case, that ritualistic type of situation should intrude into theinto an emergency room setting so that'sthat's the reasons for my dismissal.
R. 4:40-1 permits any party to move for judgment "at the close of all the evidence or at the close of the evidence offered by an opponent." If the motion for judgment is denied and the case goes to the jury, the "motion may be renewed ... within 20 days after the verdict or the jury's discharge." R. 4:40-2. The standard for determining a motion for judgment under R. 4:40-1 and a judgment n.o.v. under R. 4:40-2 are the same. The court accepts as true the evidence which supports the position of the party defending against the motion and accords that party the benefit of all legitimate inferences, and if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969); Pressler, Current N.J. Court Rules, comment on R. 4:40-1 and -2 (2000). "The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Ibid. "The purpose of the test is to ensure that the jury resolves disputed factual matters." Lewis v. American Cyanamid Co., 155 N.J. 544, 567, 715 A.2d 967 (1998).
Here, the judge's first reason for granting judgment n.o.v. to Dr. Ranzini was that she could not have been a substantial factor in causing Conor's injuries because the jury found her only 3% negligent. Under Scafidi v. Seiler, 119 N.J. 93, 102-104, 574 A.2d 398 (1990), where there is evidence that a defendant's negligence increased the risk of harm to the plaintiff it becomes a jury question whether that increased risk constituted a substantial factor in producing the injury, and thus was a proximate cause of the injury. Battenfeld v. Gregory, 247 N.J.Super. 538, 546-547, 589 A.2d 1059 (App.Div.1991). We have rejected the argument that the substantial factor test for proximate causation is linked to the percentage of negligence attributed to a particular defendant. Dubak v. Burdette Tomlin Mem'l Hosp., 233 N.J.Super. 441, 452, 559 A.2d 424 (App.Div.), certif. denied, 117 N.J. 48, 563 A.2d 817 (1989). In that medical malpractice case, the jury found the doctor only 10% negligent. The doctor argued that this finding was inconsistent with the jury's finding that he was a substantial factor in producing the end result. In rejecting this argument we said:
We are fully convinced that the jury's function of assessing relative percentages of fault is wholly distinct from its responsibility to determine questions relating to proximate cause and what constitutes a "substantial factor." In other words, the jury's determination of proximate cause bears no relation to its finding of relative fault. The following example best illustrates this fact. Ten drivers of automobiles, each horrendously intoxicated, converge and strike a pedestrian, causing his death. The jury determines that each driver was equally at fault, and thus ascribes 10% negligence to each defendant. In such a case, each driver's negligence or recklessness obviously constitutes a "substantial factor" in causing the pedestrian's death, notwithstanding the relatively small percentage of fault assigned to him.

[Ibid.]
That reasoning applies here. The jury found that Dr. Ranzini's deviation from accepted standards of medical care increased the risk of harm to Conor and that this increased risk was a substantial factor in Conor's death. Because the jury's finding on proximate cause is consistent with its finding that Dr. Ranzini was 3% negligent, the proximate cause finding provided no basis to overturn the *765 jury's verdict against Dr. Ranzini. Thus, the judge erred in granting judgment n.o.v. for Dr. Ranzini on that basis.
The other apparent basis for the judge's grant of judgment n.o.v. was that no reasonable jury could find against Dr. Ranzini based on the evidence, even when that evidence was viewed most favorably to plaintiffs and they were afforded all reasonable inferences. In a seven to one vote, the jury ruled that Dr. Ranzini deviated from accepted standards of medical practice by failing to check or manage the condition of the cord immediately after the Zavanelli maneuver in the labor and delivery room.
The record indicates that when Dr. Ranzini performed the Zavanelli maneuver she was drenched with a gush of amniotic fluid and took a step back. There was no evidence that the amniotic fluid contained meconium. Afterwards, Dr. Jiminez examined Charmaine and discovered the cord prolapse. The amount of time between the Zavanelli maneuver and the discovery of the cord prolapse is a factual matter of some dispute. Dr. Ranzini testified that Dr. Jiminez "immediately examined the patient." On the other hand, Dr. Jiminez said in her deposition testimony that after the maneuver, she examined Charmaine internally in response to seeing the baby's heart rate drop. At trial, Dr. Jiminez agreed that her description of events in her deposition testimony was possible. When asked if it could have been minutes before she checked for the cord, Dr. Jiminez answered: "Not too many minutes." Nurse Maak testified about the time gap between the Zavanelli maneuver and the discovery of the cord prolapse: "It's hard to say how much time, but it wasn't very long," but it was "[p]robably" seconds.
Plaintiffs' expert, Nathanson, had opined that Dr. Ranzini deviated from accepted standards of medical care in not checking for a cord prolapse immediately after she performed the Zavanelli maneuver. He explained that a cord prolapse immediately threatens the baby's life because its supply of oxygen is cut off.
Considering this evidence in the light most favorable to plaintiffs, Nathanson's testimony provided support for the conclusion that Dr. Ranzini deviated from the accepted standard of care in not immediately checking for a cord prolapse. Nathanson emphasized that the serious nature of a cord prolapse, as well as the immediacy of the danger to the baby, mandated that Dr. Ranzini check the cord immediately. This testimony was more than a scintilla and provided a sufficient basis to support the jury's finding of 3% negligence.
Moreover, there was testimony from Dr. Jiminez and Maak that some time elapsed, even a short amount of time, between the Zavanelli maneuver and when Dr. Jiminez checked for the cord. The jury could have concluded that Dr. Ranzini, who was standing closer to Charmaine, could have performed the internal examination more quickly than Dr. Jiminez, thereby saving precious seconds or minutes during which the baby was asphyxiated.
Peckhan had opined that Dr. Ranzini's failure immediately after the Zavanelli maneuver to check whether there was a cord prolapse proximately damaged Conor. That testimony was more than a scintilla of evidence from which a jury could conclude that Dr. Ranzini's negligence was a substantial factor in causing Conor's brain damage and ultimate death. Under Dolson there was more than a scintilla of evidence to support the jury's verdict. The judge thus erred in granting judgment n.o.v.
In addition to these substantive grounds, procedural irregularities favor reversing the judgment n.o.v. and reinstating the jury's verdict in the case. Under R. 4:40-2, a judgment n.o.v. cannot be entered unless a motion for judgment or its equivalent has been made during trial. Surkis v. Strelecki, 114 N.J.Super. 596, 599-600, 277 A.2d 888 (App.Div.), certif. *766 denied, 59 N.J. 266, 281 A.2d 528 (1971); Pressler, Current N.J. Court Rules, comment on R. 4:40-1 & -2 (2000). Here, Dr. Ranzini did not move for judgment either at the close of plaintiffs' evidence or at the close of all the evidence, and the record did not support the grant of such a motion. Thus, under the rule, a judgment n.o.v. was inappropriate.[4]
Recognizing the procedural issues, Dr. Ranzini argues, relying on Logan v. N. Brunswick Township, 129 N.J.Super. 105, 108, 322 A.2d 467 (App.Div.), certif. denied, 66 N.J. 328, 331 A.2d 28 (1974), that her motion for summary judgment before trial was equivalent to a motion for judgment. In Logan, the judge entered judgment for defendant township after the jury found the township negligent, but plaintiff contributorily negligent. On post-trial motions, the judge ruled that the issue of contributory negligence, had been wrongly submitted to the jury and thus entered judgment in favor of plaintiff n.o.v. In Logan, under the law prior to comparative negligence, we held that judgment n.o.v. was properly entered even though plaintiff had made no motion for judgment during trial because plaintiff had made the equivalent of a motion for judgment by moving to strike the defense of contributory negligence. Id. at 109, 322 A.2d 467.
However, here, unlike Logan, Dr. Ranzini's motion for summary judgment was made on a legal ground unrelated to the ground on which judgment n.o.v. was entered, i.e., on the theory that under the Good Samaritan Act she had no preexisting duty to provide assistance to plaintiff. The grant of judgment n.o.v. to Dr. Ranzini was on an entirely different legal basis. Indeed, in granting judgment n.o.v. the judge said: "I don't remotely agree with [defense counsel's] thought about the [ ] good samaritan doctrine." Thus, defendant made no motion prior to, or during, trial equivalent to a motion for judgment.[5]
We, therefore, reverse the grant of judgment n.o.v. and remand for reinstatement of the jury verdict against Dr. Ranzini.

III.
Plaintiffs contend that the judge erred by giving the jury a proximate cause instruction that, in accordance with Scafidi v. Seiler, supra (119 N.J. 93, 574 A.2d 398), takes into account a preexisting condition. They argue that there was no evidence of a preexisting condition.
Scafidi, supra (119 N.J. at 101-113, 574 A.2d 398), formulated a standard for causation in medical malpractice cases where a defendant's negligence combines with a preexisting condition to cause an injury. Scafidi considered the standard proximate cause instruction inadequate to deal with a preexisting injury case, reasoning that the standard charge on proximate cause presupposes that "defendant's negligence began a chain of events leading to the plaintiff's injury." Id. at 102, 574 A.2d 398 (emphasis added). That is not the case if the plaintiff suffers from a preexisting condition. Thus, the Court formulated a more relaxed test for causation in such cases:
[T]he jury is first asked to verify, as a matter of reasonable medical probability, that the deviation is within the class, i.e., that it increased the risk of harm from the preexistent condition. Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we use *767 the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes. The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.

[Id. at 109, 574 A.2d 398 (citations omitted).]
Here, the trial judge gave the Scafidi proximate cause charge over plaintiffs' objection that there was no preexisting condition. The judge said that hypoxia was the preexisting condition and pointed out that the prolapsed cord existed before Dr. Ranzini came on the scene. The judge gave the following proximate cause charge:
Let's go to the concept thatat the time that Dr. Ranzini [defendant] came on the scene. You may decide that the baby was significantly compromised or you may decide that the baby wasn't. You may decide that the baby had severe hypoxia or lack of oxygen or you may decide that the baby didn't. That's totally within your purview.
But if you feel that there was some compromise on the part of the baby before Dr. Ranzini came on the scene into the labor and delivery room, then this charge applies and you also say see on the top, it says this charge relates to Plaintiff [Velazquez's] charge against Dr. Ranzini. All right?
If you find that the Plaintiff has proven that Dr. Ranzini was negligent, i.e., that she departed from a recognized standard of care, then you must decide whether her negligence was a proximate cause of the Plaintiff's injury or loss.
When the Plaintiff came under the care, that is when Conor came under the care of Defendant Dr. Ranzini, he may have had a preexisting condition. It may have been a hypoxia, a loss of gas exchange or too much CO2 or too little oxygen or what have you, which by itself had a risk of causing the Plaintiff the harm he ultimately experienced in this case.
However, the claim is that the Defendant Ranzini's negligence increased that risk of harm and produced the ultimate injury, here the three years and the death that occurred to Conor.

* * *
To establish proximate cause under these circumstances, first, the Plaintiff must prove by a preponderance of the credible evidence that the negligence alleged increased the risk of harm posed by Plaintiff's preexisting condition.
Second, Plaintiff must prove by a preponderance of the evidence that the increased risk was a substantial factor in producing the ultimate result, that [If] the negligent act was itself not too remotely or insignificantly related to the ultimate result.
Then in a legal sense such negligent act does not constitute a substantial factor.
Contrary to plaintiffs' contention, there was ample evidence that Conor suffered from a preexisting condition at the time Dr. Ranzini came into the delivery room. Even before Charmaine was admitted to the hospital on the evening of February 9, 1994, Conor had stopped moving. Nathanson, plaintiffs' own expert, stated that this was "a very ominous turn of events" because it indicated a compromised baby. Once admitted, Charmaine scored four points out of a possible ten on a biophysical profile, indicating, according to Nathanson, "probable asphyxia" of Conor. The next morning, Dr. Jiminez could find no variability in Conor's heart beat, which, according to Nathanson, is an indicator of possible fetal brain damage from hypoxia.
In the delivery room, matters went from bad to worse before Dr. Ranzini came to assist Dr. Jiminez. After a slow labor, Conor's head was delivered with the umbilical cord around his neck. Delivery of the *768 rest of the baby was not possible because Conor's shoulder was jammed against plaintiff's pubic bone, i.e., shoulder dystocia. Absent immediate delivery shoulder dystocia would lead to hypoxia in the baby. Dr. Jiminez unsuccessfully tried several maneuvers to deliver Conor before calling for help. Dr. Ranzini then responded to Dr. Jiminez's request for assistance. Based on this record, the judge appropriately gave the Scafidi proximate cause charge because it is apparent that Dr. Ranzini did not begin the chain of events that led to Conor's ultimate injury.

IV.
Plaintiffs contend that the judge who substituted for the trial judge on the second day of jury deliberations erred in failing to play back certain testimony to the jury and that she incorrectly answered one of the jury's questions regarding that testimony.
On the second day of deliberations the jury sent three questions out to the judge:
[1] Did Dr. Jiminez testify that she replaced or fixed the cord in the O.R.?
[2] Did Dr. Jiminez testify that she told Dr. Ranzini, nurses Maak or Healy that the cord was fixed and
[3] [D]id nurses Maak or Healy testify that Dr. Jiminez told them the cord was fixed?
The judge ruled out the possibility that these questions could be answered through a play back of the sound recording of the relevant testimony:
As I previously stated, the Clerk that recorded this testimony is not available. It would be virtually impossible to line it up correctly without tremendous delay. I usually do not allow play backs in my trials. I usually have the jurybring them back and that's what I intend to do here, is bring them in, tell them they have to use their collective memory, whatever that is, and rely upon that.
The judge then asked the parties for their views. With regard to the first question, whether Dr. Jiminez testified that the cord was fixed, plaintiffs' attorney recalled that Dr. Jiminez's testimony was contradictory on this point. Accordingly, he proposed that the jury be told to rely on their own memory. Defense counsel assented to this course of action. So, the judge told the jury with regard to question one: "You will have to rely on your collective memory in reference to that question, all right."
As to question two, whether Dr. Jiminez testified that she told Dr. Ranzini, Maak, or Healy that the cord was fixed, both attorneys agreed that Dr. Jiminez had testified that she could not recall or had no specific recollection. Thus, in response to question two, the judge told the jury: "The witness testified that she had no specific recollection on that issue."
With regard to question three, whether Maak and Healy testified that Dr. Jiminez told them the cord was fixed, both attorneys agreed that Healy testified that Dr. Jiminez told her that the cord had been fixed. However, the attorneys disagreed with what the judge should tell the jury with regard to Maak's testimony. Plaintiffs' attorney requested that the jury be instructed that Maak testified that she had no conversation with Dr. Jiminez regarding whether the cord was fixed. Plaintiffs' attorney said her notes were that Maak was asked that question and replied "no." On the other hand, the defense attorney wanted the judge to tell the jury that there was no testimony from Maak on this factual issue. The judge took the course suggested by defense counsel; she told the jury: "As to Nurse Maak, there was no testimony on that issue. As to Nurse Healy, she testified that the conversation she had with Dr. Jiminez was either that the cord was fixed or replaced."
The decision on whether to grant the jury's request to read back testimony rests within the sound discretion of the trial court. State v. Wolf, 44 N.J. 176, 186, 207 A.2d 670 (1965); State v. Richardson, 208 N.J.Super. 399, 406, 506 A.2d 43 *769 (App.Div.), certif. denied, 105 N.J. 552, 523 A.2d 188 (1986). However, absent unusual circumstances, such requests should be granted. Ibid. A judge should not generally refuse to grant the jury a read back merely because the reading would take time. State v. Wolf, supra (44 N.J. at 186, 207 A.2d 670). These rules also apply to proceedings, such as those here, which are sound recorded rather than stenographically transcribed. State v. Middleton, 299 N.J.Super. 22, 31, 690 A.2d 623 (App.Div. 1997).
State v. Richardson, supra (208 N.J.Super. at 406-408, 506 A.2d 43), is similar to the instant case. There, during deliberations, the jury sent a note out to the judge which simply read "[t]ime of arrest." Id. at 406, 506 A.2d 43. The judge told the attorneys that he believed a read back of the testimony regarding defendant's time of arrest was unnecessary and counsel agreed to his proposed summary, which defense counsel characterized as "a fair summary." Ibid. We noted that the jury did not specifically request a read back but thought "the distinction between" the jury "asking a question based on the evidence, and on the other hand asking to hear certain testimony read, is a distinction of form, not substance." Id. at 406-407, 506 A.2d 43. We said: "A summarization of testimony by the trial judge raises the possibility that the jury may be given an erroneous view of the testimony, and is therefore much less desirable than having the actual transcript read." Id. at 407, 506 A.2d 43. Although the judge mistakenly exercised his discretion in failing to direct a read back because his summary had some minor inaccuracies, we declined to reverse because "the minor inaccuracies did not have the capacity to mislead the jury." Ibid.
Here, any error in refusing to read or play back the testimony to the jurors, rather than giving them a summary or referring them to their memory, was at most harmless error. R. 2:10-2.
A play back or read back of the testimony may have been particularly desirable here because a substitute judge was formulating a response to the jury's questions. Merely because the testimony is sound recorded and there might be a delay is not sufficient to justify not providing a play back if the jury requests it or the attorneys disagree as to the proper response. See State v. Middleton, supra (299 N.J.Super. at 30-31, 690 A.2d 623).
Plaintiffs only argue that the judge's answer to the third question, whether Maak and Healy testified that Dr. Jiminez told them the cord was fixed, was incorrect. The judge told the jury that there was no testimony from Maak on this question. But during plaintiffs' cross-examination of Maak, the following ensued:
Q ... So Dr. Jiminez is doing the surgery. She's assisted by Dr. Bonito. You're over at neonatology. You're not sure where Jeanene Healy was. What was Dr. Ranzini doing from the time period that she came back into the operating room to the delivery of the baby?

* * *
A She was in ... the room. She had come into the room again. I don't know what she did.
Q Did you see her do anything?
A I was over in the corner with neonatology. I didn't see her after she came into the room.

* * *
The Court: Did you hear her have any type of conversation.
Q Did you hear her? Excuse me. I'm sorry. Did you hear her have any conversation?
A No.
So, Maak did in fact testify that she did not hear any conversation between Drs. Jiminez and Ranzini after Dr. Ranzini came back into the operating room. This is not wholly inconsistent with Dr. Ranzini's testimony that Dr. Jiminez told her that the cord was fixed at this time. We *770 thus cannot conclude that the judge's answer that Maak gave no testimony on this issue was inaccurate.
Nonetheless, even if inaccurate, it was not clearly capable of leading the jury to an unjust result. Maak's testimony that she did not hear such a conversation is neither compelling nor mutually exclusive. She also testified that she was "over in the corner with neonatology" and could not see what Dr. Ranzini was doing. Because Maak was otherwise occupied, she might not have heard everything that was said. It may be reasonably inferred that, in the midst of this emergency C-section, Maak would be absorbed in her work and might not hear the conversation between the two doctors.
In sum, any error was harmless.

V.
Plaintiffs assert that the trial judge abused his discretion in refusing to allow the jury to see two videotapes depicting a day in the life of Conor. The judge denied plaintiffs' pretrial motion to show these videotapes to the jury on the ground that Dr. Ranzini should have been notified prior to making the tapes and allowed to be present during the tapings. The judge reasoned that the videos were akin to an experiment. Nonetheless, he allowed plaintiffs to display to the jury various still pictures taken from the tapes and provide testimony about the services provided Conor on a daily basis during his life.
We reviewed the videotapes. The first tape, about forty minutes long, was made on August 22, 1994, when Conor was approximately six months old. It shows Charmaine caring for Conor, including suctioning out his nose and mouth, feeding him through a stomach tube, giving him physical therapy, and bathing him. The tape includes a voice-over narration explaining her actions. The tape also shows Conor breathing through a nasal catheter and connected to various machines that monitored his heartbeat and breathing. Throughout the tape, Conor looks awake and alert, but not very responsive. It shows plaintiff caring for Conor with affection and also shows Conrad, Conor's brother, kissing him.
The second tape, about seven minutes long, was made on April 5, 1996, when Conor was three years old and has no voice-over narration. By this time, Conor had a tracheostomy tube inserted in his throat through which he breathed. The tape shows a nurse caring for Conor by suctioning out this tube, feeding him through a stomach tube, and injecting his medicine.
It is well settled that properly authenticated films or videotapes are admissible. Balian v. General Motors, 121 N.J.Super. 118, 125, 296 A.2d 317 (App.Div.1972), certif. denied, 62 N.J. 195, 299 A.2d 729 (1973). Our courts have permitted "day in the life" tapes "once the trial judge has examined the content to determine whether it is relevant and probative and is an accurate representation of the impact of the injuries upon the subject's day-to-day activities." Schiavo v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 362, 368, 660 A.2d 515 (App.Div.1995). See also Ocasio v. Amtrak, 299 N.J.Super. 139, 154-155, 690 A.2d 682 (App.Div.1997) (judge did not err in admitting "day in the life" videotape). The standard of review is abuse of discretion. Ocasio, supra (299 N.J.Super. at 154-155, 690 A.2d 682).
Here, the judge barred the videotapes on the ground that Dr. Ranzini (or presumably her representative) should have been permitted to be present at the tapings. Dr. Ranzini suggests that this ruling was required under Balian v. General Motors, supra (121 N.J.Super. at 124-125, 296 A.2d 317), where the trial judge permitted defendant to show the jury a film of a reconstruction of an automobile accident in conjunction with its expert's testimony. Balian held that this was reversible error:
[A]s a prerequisite to the admission into evidence of motion pictures of a reconstructed event or a posed demonstration *771 taken during the pendency of an action, fundamental fairness dictates that the party proposing to offer such evidence give notice thereof and an opportunity to his adversary to monitor the experiment and the taking of the film.

[Id. at 131, 296 A.2d 317.]
However, Balian is inapplicable here because the "day in the life" videotapes of Conor were not a "reconstructed event or a posed demonstration." In Ocasio v. Amtrak, supra (299 N.J.Super. at 154-155, 690 A.2d 682) and Schiavo v. Owens-Corning Fiberglas Corp., supra (282 N.J.Super. at 368-369, 660 A.2d 515), we upheld the admission of "day in the life" videotapes to aid the jury in understanding the plaintiffs' injuries. There was no requirement that defendants be given the opportunity to be present at the tapings. Ocasio and Schiavo are the relevant precedent here, not Balian.
Nonetheless, a correct result predicated upon an incorrect basis does not preclude an affirmance of that ruling. Isko v. Planning Bd. of Livingston Tp., 51 N.J. 162, 175, 238 A.2d 457 (1968); Ellison v. Schenck, Price, Smith & King, 280 N.J.Super. 169, 180, 654 A.2d 1024 (App. Div.), certif. denied, 142 N.J. 516, 665 A.2d 1109 (1995). Under the circumstances we do not conclude here that the judge abused his discretion in excluding these tapes.
The information that the videotapes provide was cumulative in view of the extensive testimony of Charmaine Velazquez, her husband, and Conor's nurses, on Conor's condition and the extraordinary care that Conor needed to stay alive. In addition, the judge allowed the jury to see still photographs made from the videotapes. In short, the jurors were given the substance of the relevant and material information contained in the videotapes, even though they were not allowed to see them. As we recently pointed out: "There is a danger that a jury will place inordinate weight on the moving pictures." Suanez v. Egeland, 330 N.J.Super. 190, 195-196, 749 A.2d 372 (App.Div.2000); see also Macaluso v. Pleskin, 329 N.J.Super. 346, 353, 747 A.2d 830 (App.Div.) (holding that the trial court committed reversible error in admitting a videotape entitled "Soft Tissue Animation" because it did more than illustrate expert's testimony, it provided the jury with additional information), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000).
Simply stated, although for different reasons, the judge did not abuse his discretion in excluding the two videotapes.

VI.
Plaintiffs maintain that the judge mistakenly exercised his discretion in allowing Dr. Ranzini's expert, Dr. Kreitzer, to testify beyond the scope of his report. Specifically, plaintiffs contend that Kreitzer should not have been allowed to express the opinion at trial that defendant Dr. Ranzini was not negligent based upon her testimony that Dr. Jiminez told Dr. Ranzini that she had replaced the cord because this factual contention was not included in Kreitzer's report.
In a report dated December 4, 1995, Kreitzer opined that Dr. Ranzini was not negligent based on her actions after plaintiff was moved to the operating room:
When the umbilical cord prolapse was recognized, Dr. Ranzini did everything she could to expedite performance of the C-section. She was not in the room when Dr. Jiminez removed her hand from the vagina to get ready to do the C-section. If, indeed, the cord was still prolapsed, Dr. Jiminez should have kept her hand in, while preparations for the C-section were being made.
At trial, Dr. Ranzini testified that Dr. Jiminez told her in the operating room, "don't worry about the cord prolapse, it's been fixed." Later, Dr. Ranzini's attorney asked Kreitzer the following hypothetical question:
I want you to assume for the next claim of deviation the following facts. I want you to assume that after Dr. Ranzini *772 went down to the ... neighboring operating room and told Dr. Benito to help her with the C-section, she returned to the operating room where Mrs. Velazquez was, was standing outside at the scrub sink in preparing to scrub, and while she was standing there she looked through the window into the operating room and observed that Dr. Jiminez had taken her hand out of the vagina and was preparing to do the C-section herself.
I want you to further assume that Dr. Ranzini immediately, without scrubbing, went into the operating room to find out the status of the cord. I want you to further assume that Dr. Jiminez told Dr. Ranzini that she had taken her hand out of the vagina because the cord had been replaced, or words to that effect.

* * *
Based on those facts, was it a deviation for Dr. Ranzini, upon her return to the operating room, not to herself takeput her hand into Mrs. Velazquez's vagina and manage the baby's head?
A [Kreitzer] No, it was clearly not a deviation.

* * *
A Because if the cord ... had been replaced and this had been a successful funic replacement, then there was no need to keep the head from trying to compress the cord that was no longer in the vagina.
Q I want you to assume that the cord was not replaced and that Dr. Jiminez was mistaken. Was that a deviation by Dr. Ranzini?
A No. It would have been a deviation by Dr. Jiminez
(emphasis added).
Plaintiffs objected to this hypothetical question because Kreitzer never mentioned in his report and deposition the conversation in the operating room between Drs. Jiminez and Ranzini. The judge permitted the question, citing McCalla v. Harnischfeger Corp., 215 N.J.Super. 160, 521 A.2d 851 (App.Div.), certif. denied, 108 N.J. 219, 528 A.2d 36, 37 (1987), for the proposition that though an expert's testimony may be limited to the opinions expressed in a written report, the background information that supports these opinions may be discussed at trial. The judge allowed plaintiffs to recall their liability expert to respond to Kreitzer's testimony. The judge also gave the jury the following limiting instruction with regard to defendant's hypothetical question:
I'm going to charge you at the close of this case that insofar as an expert is concerned, if you find that the factual premises upon which that expert bases his or her opinion have not been established, then you're free to disregard any portion of that opinion that you feel is predicated on that particular factual basis.
There's a sharp dispute between the parties as to whether Dr. Jiminez said something about, I replaced the cord.... I forget the exact magic words.
So, it may very well be that this portion of the testimony you consider as valuable or valueless. But as far as I'm concerned, I am going to charge you that if you feel that an expert has based his or her opinion upon some facts of which there is no foundation, then obviously you may feel that the conclusions drawn by that expert have no validity.....
The discovery rules state that any party may require any other party "to state the substance of the facts and opinions to which the expert is expected to testify ... and a summary of the grounds for each opinion...." R. 4:10-2(d)(1). "An expert's testimony at trial may be confined to the matters of opinion contained" in his or her report. Mauro v. Owens-Corning Fiberglas, 225 N.J.Super. 196, 206, 542 A.2d 16 (App.Div.1988), aff'd sub nom. Mauro v. Raymark Indus., Inc., 116 N.J. 126, 561 *773 A.2d 257 (1989). However, "the logical predicates for and conclusions from statements made in the report are not foreclosed." McCalla v. Harnischfeger Corp., supra (215 N.J.Super. at 171, 521 A.2d 851).
"Although a trial judge is given wide discretion in determining the appropriate sanction for breach of the discovery rules, `the sanction must be just and reasonable.' " Ibid. A judge is strongly urged to suspend the sanction of exclusion when certain factors are present: "(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from admission of the evidence." Congiusti v. Ingersoll-Rand Co., 306 N.J.Super. 126, 132, 703 A.2d 340 (App.Div.1997) (quoting Westphal v. Guarino, 163 N.J.Super. 139, 145-146, 394 A.2d 377 (App.Div.), aff'd o.b., 78 N.J. 308, 394 A.2d 354 (1978)).
Here, the trial judge properly allowed Kreitzer to answer the hypothetical question which assumed that Dr. Jiminez told Dr. Ranzini that she fixed the cord. Dr. Ranzini did not try to solicit an additional or novel opinion from Kreitzer at trial. Kreitzer's opinion at trial was the same as in his report, i.e., that Dr. Ranzini met the standard of medical care in her actions after Dr. Jiminez stopped managing the cord prolapse. The only difference between Kreitzer's trial testimony and his report was that his testimony included an extra factual basisthe conversation between Drs. Jiminez and Ranzini in the operating room. Under McCalla, supra (215 N.J.Super. at 171, 521 A.2d 851), this additional fact is a "logical predicate" of the expert's opinion which is not foreclosed.
Furthermore, the judge was within his discretion in refusing to impose the sanction of exclusion of Kreitzer's expert testimony. Plaintiffs concede that they have no evidence that Dr. Ranzini had a design to mislead them. Nor were plaintiffs surprised by introduction of this basis of Kreitzer's opinion. Nathanson, plaintiffs' own liability expert, testified in a deposition that was admitted at trial that he was aware of the contention that Dr. Jiminez told someone in the operating room that the prolapsed cord was retracted.

VII.
Dr. Ranzini's cross-appeal addresses the judge's denial of her pretrial motion for summary judgment on the ground that she was immunized from liability by the Good Samaritan Act (the Act), N.J.S.A. 2A:62A-1 to -3.
Because the judgment n.o.v. was entirely in her favor, she arguably lacks standing to cross-appeal the earlier denial of her motion for summary judgment. Only a party aggrieved by a judgment may appeal from it. Howard Sav. Inst. of Newark v. Peep, 34 N.J. 494, 499, 170 A.2d 39 (1961); Denis v. City of Newark, 307 N.J.Super. 304, 310 n. 4, 704 A.2d 1003 (App.Div.1998); Ellison v. Evergreen Cemetery, 266 N.J.Super. 74, 78, 628 A.2d 793 (App.Div.1993). But, because we have reversed the judgment n.o.v. and the issue now has vitality, as well as being likely to reoccur in other cases, we address it.
On November 21, 1997, the judge denied Dr. Ranzini's summary judgment motion, reasoning that the Act is inapplicable to physicians who respond to an emergency within a hospital. The Act provides:
Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, or any person who is a volunteer member of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil *774 damages as a result of any acts or omissions by such person in rendering the emergency care.[6]

[N.J.S.A. 2A:62A-1.]
The original version of the Act, enacted in 1963, was accompanied by a statement that explained its purpose:
Frequently persons receive no emergency care when needed, because persons licensed to practice the healing arts or render services ancillary thereto at the scene of an accident or emergency are fearful their actions taken in good faith to care for the injured person might subsequently subject them to civil suit. The purpose of this bill is to encourage the rendering of aid to injured persons at the scene of an accident or emergency without fear of civil liability.
[Statement accompanying Assembly Bill No. 62 (1963) quoted in Praet v. Borough of Sayreville, 218 N.J.Super. 218, 223, 527 A.2d 486 (App.Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987)].
The Act is meant to encourage persons to render aid in circumstances where they do not otherwise have a duty to do so. Praet v. Borough of Sayreville, supra (218 N.J.Super. at 223-225, 527 A.2d 486). Persons who are under a duty to act are impelled to act by that duty and, thus, are not entitled to the immunity afforded by the Act. Id. at 224, 527 A.2d 486.
Dr. Ranzini contends that the judge erred in ruling that the Act has no applicability to a doctor responding to an emergency or accident within the walls of a hospital. She points out that the statute applies broadly to all medical care "at the scene of an accident or emergency." N.J.S.A. 2A:62A-1. She urges that this language does not appear to limit the site of the accident or emergency to those occurring outside a hospital.
The issue of whether the Act applies to physicians rendering assistance to patients within a hospital is novel in New Jersey, but has been addressed in other states. "The first step in any statutory analysis is to examine the plain language of the statute as the clearest indication of its meaning." Bergen Commercial Bank v. Sisler, 157 N.J. 188, 201, 723 A.2d 944 (1999). Statutory construction does not generally turn on literalisms, but "on the breadth of the objectives of the legislation and the common sense of the situation." Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City, 55 N.J. 86, 100, 259 A.2d 698 (1969).
The Act addresses two scenarios where emergency care is immunized: (1) "at the scene of an accident or emergency" or (2) "while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered...." N.J.S.A. 2A:62A-1. The express provision of immunity in transit to a hospital suggests that the Legislature anticipated that the scene of the accident or emergency would be somewhere other than a hospital. If we take into account that persons under a duty to act are not entitled to immunity under the Act, Praet, supra (218 N.J.Super. at 224, 527 A.2d 486), this language can also be read to suggest that in that clause the statute intended that the immunity stop at the door of the hospital. Similarly, the phrase "at the scene" in the quoted statute appears to modify both the term accident and emergency and more typically applies to a phrase other than where medical care is typically rendered. Thus, we construe the language of the statute to imply that a physician responding to an emergency within a hospital is outside the coverage of the Act.
Further, immunizing doctors who give emergency care within a hospital does *775 nothing to promote the statutory goal of providing care to those who would not otherwise receive it. As expressed by the California court in Colby v. Schwartz, 78 Cal.App.3d 885, 144 Cal.Rptr. 624, 628 (Ct. App.1978):
Typically, it was the roadside accident victim who, as a result of the strictures of the common law malpractice doctrines, was left uncared for. However, hospital patients such as decedent have historically enjoyed the benefits of full medical attention. There is no need for special legislation to encourage physicians to treat this class of individuals.
Moreover, a physician responding to an emergency within a hospital is not hampered by the same disabilities as a physician at a roadside accident or emergency scene. A doctor at a roadside accident or emergency scene has none of the modern equipment or the assistance of other doctors and nurses which he or she would have available in a hospital. Inadequacy of equipment and staff at the scene of an accident or emergency is an alternative rationale given for immunizing doctors through Good Samaritan laws. See Stewart Reuter, Physicians as Good Samaritans: Should They Receive Immunity for Their Negligence When Responding to Hospital Emergencies?, 20 J. Legal Med. 157, 168, 189 (1999).
Other states' Good Samaritan laws and the courts' interpretation of them do not in our view compel a contrary result. Indeed, twelve jurisdictions' Good Samaritan statutes expressly exclude emergency care provided in hospitals or other health care facilities (District of Columbia, Florida, Idaho, Indiana, Kentucky, Maine, Minnesota, New York, Ohio, Oregon, Rhode Island and Wisconsin).[7]Id. at 168 n. 69. For example, the Good Samaritan law in the District of Columbia provides:
Any person who in good faith renders emergency medical care or assistance to an injured person at the scene of an accident or other emergency in the District of Columbia outside of a hospital... shall not be liable in civil damages for any act or omission, not constituting gross negligence, in the course of rendering such care or assistance.

[D.C. Code Ann. § 2-1344(a) (1981) (emphasis added).]
In addition, the Arizona Supreme Court has held that the "site of an accident or emergency" in its Good Samaritan statute does not include hospitals or other health care facilities. Guerrero v. Copper Queen Hosp., 112 Ariz. 104, 537 P. 2d 1329, 1331 (1975).
In contrast, Good Samaritan laws in six states expressly include hospitals and other health care facilities among the sites where immunity is available. Reuter, supra (20 J. Legal Med. at 168). These states are Alaska, California, Colorado, Louisiana, Michigan, and Texas. Id. at 193 n. 73.[8] For example, in California, a physician is granted immunity for providing emergency care in "the emergency rooms of hospitals in the event of a medical disaster." Cal. Bus. & Prof.Code § 2395 (West 1986).
In addition, courts in four states (Georgia, Illinois, Oklahoma, and Utah) have interpreted the general language of their respective Good Samaritan laws to include the hospital as a place where doctors are immunized when giving emergency care.
*776 See Clayton v. Kelly, 183 Ga.App. 45, 357 S.E.2d 865, 868 (1987) ("Neither is [the physician] deprived of immunity by the fact alone that he works at the hospital, or is present at the hospital, or is called to the hospital when the emergency arises"); Johnson v. Matviuw, 176 III App.3d 907, 126 Ill.Dec. 343, 531 N.E.2d 970, 975-977 (1988) (holding that a physician who renders emergency care in a hospital is covered by the Good Samaritan law), appeal denied, 125 Ill.2d 566, 130 Ill.Dec. 481, 537 N.R.2d 810 (1989); Jackson v. Mercy Health Ctr., 864 P.2d 839, 844 (Okla.1993) (holding that hospital is covered by Good Samaritan law when it gives emergency treatment to a visitor but not a patient); Hirpa v. IHC Hospitals, Inc., 948 P.2d 785, 788 (Utah 1997) ("[W]e conclude that doctors are protected by the Good Samaritan Act when they respond to an in-hospital emergency, if they have no preexisting duty to do so"). However, even in these states, a physician responding to an emergency within the hospital is not immunized if the doctor had a preexisting duty to act. Hirpa, supra (948P.2d at 788).
Thus, legislatures and courts around the country are split on the wisdom of providing physicians the protection of Good Samaritan laws when responding to an emergency within a hospital. Although the Act is not wholly unambiguous, we adopt the view that the protection of the Good Samaritan Act stops at the door of the hospital.[9] Reuter (a doctor as well as a lawyer), in Physicians as Good Samaritans, supra (20 J. Legal Med. at 188), persuasively presents arguments in favor of this position. He points out that physicians are already obligated to provide emergency service to patients within the hospital walls through their relationship with the hospital. Thus, immunizing these doctors does not encourage them to treat people who would otherwise go untreated. Id. at 189. He also points out that physicians in hospitals have modern diagnostic and therapeutic equipment at their disposal and so they are not disadvantaged in the same way that a doctor trying to treat someone at the roadside would be.[10] Further, immunizing physicians in hospitals might have the adverse effect of lowering the quality of medical care in those hospitals without justification. Ibid. The author concludes with persuasive arguments that in-hospital application of Good Samaritan type immunity is also not necessary:
On the other hand, extension of Good Samaritan statutes to physicians responding to emergencies in hospitals is unnecessary and immunizes negligent care in an environment in which no justification for such immunity exists. It gives too much protection to the physician at the expense of the malpractice victim. * * * A patient has a right to *777 expect that care provided in today's hospitals meets a reasonable standard, whether it be in the ordinary course of hospital care or in an emergency, and whether it be provided to the physician's own patient or to a stranger. [Id. at 193].
Here, it is undisputed that Dr. Ranzini responded to an emergency within the hospital, and thus, as a matter of law, she was not entitled to the protections of the Act. There was no genuine issue of material fact. R. 4:46-2. Because we conclude that the judge correctly denied Dr. Ranzini's motion for summary judgment on the ground that the Act does not cover physicians working within a hospital, we affirm on the cross-appeal.
The judgment is reversed in part and the matter is remanded for reinstatement of the jury verdict in accordance with this opinion. The decision on the subject of the cross-appeal is affirmed.
NOTES
[1] The various other defendants either settled with plaintiffs or were dismissed from the case. Reference in the singular to defendant refers only to Dr. Ranzini, unless the context otherwise indicates.
[2] At oral argument it was represented by Dr. Ranzini's attorney that she is a state employee under a state program. However, no Tort claims Act (N.J.S.A. 59:1-1, et seq.) issue is projected in this appeal.
[3] Hypoxia is a reduction of oxygen to the fetal tissue.
[4] We do not hold that a trial judge may never sua sponte enter judgment n.o.v. or invite such a motion, even orally. However, in order to support such a ruling there should be clear and compelling reasons grounded in the evidence presented.
[5] The court's sua sponte grant of judgment was also not made "within 20 days after the verdict or the jury's discharge," R. 4:40-2(b), but over a month later. Moreover, the judge did not provide the parties an opportunity to brief the issue of whether judgment n.o.v. should be entered on Dr. Ranzini's behalf. See ibid. ("Briefs shall be submitted with the renewal of the motion for judgment.").
[6] The emphasized portion of the statute was added by amendments in L. 1987, c. 296, § 1, effective November 2, 1987.
[7] The respective statutory citations are: D.C.Code Ann. § 2-1344(a); Fla. Stat. Ann. § 768.13(2); Idaho Code § 5-330; Ind.Code Ann. § 34-30-12-1(a); Ky.Rev.Stat. Ann. § 411.148(1); Me.Rev.Stat. Ann. 14, § 164; Minn.Stat. Ann. § 604A.0-1(2)(b); N.Y. Educ. Law § 6527(2); Ohio Rev.Code Ann. § 2305.23; Or.Rev.Stat. § 30.800(1)(a)(A); R.I. Gen. Laws § 5-37-14; Wis. Stat. Ann. § 895.48(1).
[8] The respective statutory citations are: Alaska Stat. § 09.65.090(a); Cal. Bus. & Prof.Code § 2395; Colo.Rev.Stat. § 13-21-108-1, § 13-64-202(3); La.Rev.Stat. Ann. § 37.1731(A)(2)(a); Mich. Stat. Ann. § 691.1502(2)(1); Tex. Civ. Prac. & Rem.Code Ann. § 74.001(c).
[9] The Legislature is at liberty to address the matter and amend the Act should it choose to do so.
[10] In response to a potential distinction as to small hospitals in rural settings the author states:

Moreover, the courts, are, to some degree, naive about the interphysician and hospital-physician relationships that exist in hospitals. When physicians drive past the site of a roadside accident or walk across the street to avoid the victim of a heart attack, the only consequences of that conduct are a few pangs of conscience. Only they know that they have violated their Hippocratic Oath. This is not so in hospitals. The courts cannot imagine what would happen to the reputation of, for example, the pediatrician who does not respond to a call for assistance with an intubation, a surgeon who does not respond to another surgeon's request for assistance with an operation, or an obstetrician who does not respond to a request to deliver a baby when the patient's obstetrician is, for some reason, unavailable. Such a physician would be scorned by his or her colleagues and probably would be disciplined by a hospital committee. A physician in a hospital setting does not refuse a request from a colleague to assist in the care of a patient who is having an emergency, whether or not that physician has a preexisting duty to do so. Hospital patients are therefore not persons in emergency situations who might not otherwise receive care because of a physician's fear of malpractice litigation. [Id. at 187].