282 N.J. Super. 362 (1995)
660 A.2d 515
ROBERT SCHIAVO, EXECUTOR OF THE ESTATE OF ALBERT SCHIAVO, DECEASED, AND ROBERT SCHIAVO, IN HIS OWN RIGHT AND DONA SCHIAVO, IN HER OWN RIGHT, PLAINTIFFS-RESPONDENTS,
v.
OWENS-CORNING FIBERGLAS CORPORATION, DEFENDANT-APPELLANT, AND GAF CORPORATION; H.K. PORTER COMPANY; SOUTHERN TEXTILE CORPORATION; EAGLE-PICHER INDUSTRIES, INC.; KEENE CORPORATION; GARLOCK, INC.; PITTSBURGHCORNING CORPORATION; JOHN DOE CORPORATION, ONE THROUGH TEN, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 1995.
Decided June 5, 1995.
*364 Before Judges DREIER, VILLANUEVA and BILDER.
Perry A. Gandelman argued the cause for appellant (Tucker, Biegel & Goldstein, attorneys; Andrew Constantine II, on the brief, Frederick E. Blakelock, on reply brief).
James J. Pettit argued the cause for respondents (Greitzer & Locks, attorneys; Mr. Pettit, on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant appeals compensatory damage and punitive damage awards entered in this mesothelioma death case. This matter is a companion case to Ripa v. Owens-Corning Fiberglas Corp., 282 N.J. Super. 373, 660 A.2d 521 (App.Div. 1995).
*365 Plaintiffs' decedent, Albert Schiavo, was born June 21, 1927. Decedent had been disabled in 1975 as a result of a car accident in which his back was injured. The last operation necessitated by the accident caused severe nerve damage leaving decedent incontinent both as to bowel and bladder. He had stopped working ten years before he was diagnosed with mesothelioma. He married his wife in 1986, after his complete disability but before the mesothelioma diagnosis. His physical activities were limited, yet he and his wife took walks together and engaged in some slight recreational activities, but they mainly stayed home together, visiting with friends and family. Decedent was diagnosed with mesothelioma in June 1988 after first experiencing chest pains in December 1987. By December 1989, eight months before his death, his health had declined rapidly. He died August 21, 1990.
Decedent's principal exposure to asbestos was during a two-year period commencing in 1957 or 1958 when he worked as a cleaner in the New York Shipyard in Camden aboard the U.S.S. Kitty Hawk,[1] which was undergoing a full restoration at the shipyard. Decedent's duties included sweeping up the dust from the asbestos insulation products as it settled. In his 1988 de bene esse deposition, decedent identified various brands of asbestos as being used on the job. Specifically, he identified Owens-Corning's product, Kaylo, HK-4 and products of Johns-Manville Corporation and Garlock, Inc.
Another worker on the Kitty Hawk, William Kimley, Sr., noted that he had seen defendant's products five days a week during the relevant periods where he had worked on board the ship. He estimated that forty to forty-five percent of the pipe covering used on the Kitty Hawk was provided by defendant. A witness for defendant, Toby Caprarola, testified that he had been on board the Kitty Hawk for approximately one and one-half years between 1956 and 1961. He identified numerous manufacturers but stated *366 that from what he had observed these manufacturers provided their products in equal amounts on board the ship. On cross-examination, however, Caprarola stated that he had said that the products were in equal amount because he could not remember the percentages supplied by the particular defendants.
One by one, the several defendants originally served by plaintiffs were dismissed from this suit. By the time the compensatory phase of the trial began in 1993, only Owens-Corning, Keene Corporation and Garlock, Inc. remained in the case. Garlock was dismissed at the end of the plaintiffs' proofs, and Keene was dismissed following the close of all proofs. Ruberoid Company (now GAF) had earlier settled and thus was no longer in the case. The judge, therefore, required the jury to allocate percentage verdicts between Owens-Corning and the settling defendant, Ruberoid. Rogers v. Spady, 147 N.J. Super. 274, 371 A.2d 285 (App.Div. 1977).
The jury determined that between these defendants, Owens-Corning was ninety-seven percent responsible and Ruberoid three percent responsible. The jury also determined that the occupational exposure to Owens-Corning's products was a substantial contributing cause of decedent's mesothelioma and death. The jury awarded decedent's estate $250,000 for pain and suffering and emotional and mental anguish from the onset of his illness until his death. Decedent's widow, Dona Schiavo, was awarded an additional $100,000 for her per quod claim for loss of consortium, society, advice and counsel prior to his death. The jury also awarded Mrs. Schiavo damages in the wrongful death action. The jury determined that $150,000 would reasonably compensate her for her pecuniary losses, including those permitted by Green v. Bittner, 85 N.J. 1, 12-14, 424 A.2d 210 (1980). In a separate punitive damage deliberation which followed the compensatory award, the jury awarded plaintiffs an additional $100,000.
Defendant has appealed from both the compensatory and punitive damage awards. It raises eight points with several subpoints.

*367 A.

Defendant first contends that the jury was tainted when three jurors heard of another punitive damage award against Owens-Corning in an unrelated mesothelioma death case. The award was returned in an adjoining courtroom while this trial was in progress.
The judge refused to declare a mistrial and instead inquired of the jury if anyone had heard or read anything about the other asbestos case. The three jurors who raised their hands were individually questioned out of the presence of the other jurors. The three said they had not discussed the matter with other jurors and all declared that the publicity would have no effect on their own deliberations. Two of the three were not picked to deliberate in the compensatory phase of the trial although they did participate in the punitive phase.
The trial judge properly ascertained that learning of this information had no appreciable potential to prevent the three jurors from reaching a fair and impartial verdict. This case in no way reaches the level of taint that was present in Waldorf v. Shuta, 3 F.3d 705 (3d Cir.1993), as urged by defendant. We therefore reject defendant's suggestion that we should be bound by the result in Waldorf.
In this case, the trial court's inquiry was adequate, and indeed, the $100,000 punitive damage award is significantly lower than the 2.2 million dollar award in the case which provided the alleged taint. We thus would not find that the jury was so inflamed by that award that it was improperly influenced in its decision in the punitive damage aspect of the case before us. Defendant also argues that the other award may have influenced the compensatory damage verdict. We will, however, be guided by the decision rendered by the trial judge who had an opportunity to see and hear the witnesses and fully appreciate the effects, if any, of the other award on the case that was before him. We find no error on this point.

*368 B.

Defendant next objects to the admission in evidence of a videotape depicting a day in the life of decedent which was prepared just three weeks before his death. The jury was never told explicitly that the time of the taping was three weeks before decedent's death, but the date clearly appeared on the screen.
Defendant claims that the videotape was cumulative evidence that had no purpose but to inflame the jury and that it should have been excluded under Evid.R. 4 (N.J.R.E. 403). Defendant further argues that the videotape was misleading in two ways. First, it did not depict decedent's condition as it existed during most of his illness, but rather only as it existed in the terminal phase when his condition had greatly deteriorated. Second, defendant claims that the videotape had in effect been staged because it had been edited.
Plaintiffs did not assert that the videotape depicted the entire period from June 1988 when the mesothelioma was first diagnosed through the death on August 21, 1990. Also, it was explained and in any event was self-evident that the tape did not depict an entire twenty-four hour period. The video camera obviously was turned off while decedent slept or when there was no activity. As much as there may have been testimonial explanations of decedent's condition, his suffering and the rigors imposed by his care were demonstrated by the videotape far more effectively than through mere testimony. If the videotape increased the compensatory awards, we cannot say that this augmentation was through any error, as opposed to the jurors' normal reaction to a graphic exposure to the effects of advanced mesothelioma.
While there is no New Jersey case specifically authorizing a "day in the life" tape, such tapes have been permitted once the trial judge has examined the content to determine whether it is relevant and probative and is an accurate representation of the impact of the injuries upon the subject's day-to-day activities. See Jones v. City of Los Angeles, 20 Cal. App.4th 436, 24 Cal. Rptr.2d 528, 531-532 (Ct.App. 1993); Ellingwood v. Stevens, 564 So.2d 932, *369 936 (Alabama 1990); Elk Corp. of Arkansas v. Jackson, 725 S.W.2d 829, 834 (Arkansas 1987); Protective Cas. Ins. Co. v. Killane, 447 So.2d 316, 317 (Fla. Dist. Ct. App.), result approved, 459 So.2d 1037 (Fla. 1984); Hahn v. Tri-Line Farmers Co-op, Inc., 478 N.W.2d 515, 524-525 (Minn. Ct. App. 1991), rev. denied (1992); Bannister v. Town of Noble, Oklahoma, 812 F.2d 1265, 1269-1270 (10th Cir.1987).
There was no challenge to the authenticity of the videotape. See State v. Wilson, 135 N.J. 4, 17, 637 A.2d 1237 (1994) and Balian v. General Motors, 121 N.J. Super. 118, 125, 296 A.2d 317 (App.Div. 1972), certif. denied, 62 N.J. 195, 299 A.2d 729 (1973). And there certainly could be no claim that this videotape was staged to depict a condition that did not in fact exist. This is not a case where an injured victim could highlight the most difficult parts of his life and gloss over tasks that could easily be performed. Decedent, as testified by his wife, was unable to function. While the camera may have been turned off because no one was performing a service for him at the time, there was no doubt that decedent did not use these breaks to be free from the cancer that was killing him. The videotape was a relevant aid to the jury as it could "uniquely demonstrate the nature and extent of" decedent's injuries. Jones v. City of Los Angeles, supra, 24 Cal. Rptr.2d at 531.

C.
Defendant next challenges the quantum of the wrongful death award. The pecuniary loss suffered by the surviving next-of-kin is the standard for damages in all wrongful death cases. Green v. Bittner, supra, 85 N.J. at 11, 424 A.2d 210; N.J.S.A. 2A:31-5. There was some evidence of decedent's actual pecuniary contributions to his family. He testified in his de bene esse deposition that he had originally intended to work until he was sixty-nine or seventy years of age, but that he was not gainfully employed during his unrelated disability from the car accident noted earlier. Green v. Bittner, supra, however, provided that *370 wrongful death awards are not limited to the loss of monetary support but also extend to the pecuniary element involved in the loss of companionship, guidance, advice and counsel. 85 N.J. at 12-14, 424 A.2d 210. Mrs. Schiavo testified that her husband helped her with problems to the best of his ability and that he had a 17.88 year presumptive life expectancy. The jury, of course, could have rejected this expectancy because of decedent's unrelated poor health. A $150,000 award for the pecuniary loss involved in 17.88 years or even some appreciably lesser time span of companionship, guidance, advice and counsel does not constitute a miscarriage of justice.
As we noted in Ripa v. Owens-Corning Fiberglas Corp., supra, where we sustained the wrongful death award of $325,000 as opposed to the $150,000 returned in this case, the award for "loss of companionship ... while high, cannot seriously be challenged.... The trial judge sustained the compensatory damage award, and we will defer to the trial judge's `feel of the case.' Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993)." 282 N.J. Super. at 387, 660 A.2d at 528. So too in this case.

D.
Defendant also contends that the ninety-seven percent liability awarded against it was unjustified in this case. Ruberoid was the only manufacturer other than defendant to be listed on the verdict sheet, and the sole witness to mention Ruberoid products on the Kitty Hawk was the defense witness, Toby Caprarola. He had identified numerous manufacturers which he claimed provided their products in equal amounts to the ship. Plaintiffs' witness, Kimley, stated that forty to forty-five percent of the pipe insulation had been defendant's. As noted earlier, Caprarola's testimony was subject to serious question, and there was little evidentiary basis to show that Ruberoid's products were present in any substantial amount.
*371 In decedent's de bene esse deposition, he identified other products, but the manufacturers of two of them were dismissed from this case since some manufactured the products in years other than those when plaintiff worked on the Kitty Hawk. Of the eight original defendants, one, GAF/Ruberoid, settled and appeared on the verdict sheet. The claims against Johns-Manville had been severed. Therefore the only defendant on the verdict sheet positively identified by decedent was Owens-Corning. This alone was an ample basis for the allocation of liability. When we consider that the jury had only the last two suppliers before it, the allocation cannot seriously be attacked. Once the liability of the tortfeasors is established, the percentage adjustment of responsibility is for the jury. Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 25, 568 A.2d 1196 (App.Div. 1989).

E.
Defendant next attacks the award of punitive damages, claiming that (1) the award was against the weight of evidence since there was no proof of actual malice or wanton and willful conduct; (2) any further award of punitive damages beyond those in other cases violates New Jersey law; (3) such further award violates the United States and New Jersey Constitutions; (4) unduly prejudicial and irrelevant evidence was admitted into the punitive phase of the trial; and (5) the punitive damages should have been governed by the "clear and convincing evidence" standard. Each of these points was raised and treated in Ripa v. Owens-Corning Fiberglas Corp., supra, 282 N.J. Super. at 394-408, 660 A.2d at 531-538. We reiterate the statements made in Ripa where we overturned the punitive damage award and remanded the case for a new trial concerning punitive damages.[2]
*372 There is, however, one significant difference between Ripa v. Owens-Corning Fiberglas Corp. and the present matter. In Ripa, with similar evidence and a similar injury and death, the jury returned a punitive damage award of 5.5 million dollars. We there determined that the Saranac study documents were admitted with an insufficient foundation. They represented the independent analysis of Kaylo from the time it was originally produced by Owens-Illinois Company in the 1940's, through the late 1950's. They were sufficiently inflammatory that if the jury accepted the fact that Owens-Corning had, prior to Ripa's exposure to Kaylo, received these documents, they alone might have provided the basis for a finding of wanton and willful conduct in not properly warning the end users of the product or others exposed to it of its potential danger.
The evidence in both cases was insufficient to show that all of the various Saranac study documents had been received by Owens-Corning as opposed to Owens-Illinois. See Ripa v. Owens-Corning Fiberglas Corp., 282 N.J. Super. at 403-407, 660 A.2d at 536-538. We also determined there that, at the very least, if the issue of the receipt of these documents was to be given to the jury, the jury should have been adequately charged under Evid.R. 8(2) (N.J.R.E. 104(b)). No such charge was given in either case.
We cannot, however, close our eyes to the effect of these documents which lacked either a sufficient foundation or a proper jury charge. In Ripa, the punitive damage award was fifty-five times as great as that in the case before us. We there noted:
Given the incriminating nature of the Saranac document showing potential adverse effects on the end users of Kaylo, the admission of the Saranac documents against Owens-Corning, without a better foundation, had the capacity to inflate the punitive damage verdict significantly. Had there been only a minimum punitive damage award returned, we might have found that there was no showing that the admission of these documents had inflamed the jury. But here there was a $5.5 million award, and we cannot say that the error was harmless.
[282 N.J. Super. at 405, 660 A.2d at 537 (Emphasis added and footnote omitted).]
*373 Here there was "only a minimum punitive damage award returned," and we are thus faced with the question that we had left open in Ripa. As we stated earlier when we discussed the issue of a possibly tainted jury, it was clear that this jury was not inflamed into returning a substantial punitive damage award. We see no basis therefore to require a new lengthy and costly retrial where there appears to have been no evidence of an adverse effect on this jury of the admission of the Saranac documents. While it is clear to us that here, as in Ripa, there was error, we are convinced that in this case the error was harmless. R. 2:10-2.
The judgment appealed from is affirmed in all respects.
NOTES
[1] This exposure somewhat overlapped but was slightly after the exposure to the plaintiff in Ripa.
[2] We note that the exposure of the plaintiff here and in Ripa significantly predate the flood of information to Owens-Corning concerning the harmful propensity of Kaylo, as revealed in cases emanating from a later time frame.