Stephen **ROSARIO, et al., Plaintiffs,**

v.

**CITY OF UNION CITY POLICE DEPARTMENT, et al., Defendants.**

**Civil Action No. 00–3702.**

United States District Court, D. New Jersey.

May 27, 2003.

Geoffrey N. Feiger, Esq., Fieger, Fieger, Kenney & Johnson, PC, Southfield, MI, for Plaintiffs.

Andrew L. Indeck, Esq., Scarinci & Hollenbeck, LLC, Lyndhurst, NJ, for Defendants.

## OPINION

WALLS, District Judge.

Defendants Glenn Gaston, Juan Loaces, Juan Mendez, and Jose Perez (collectively the "Defendants") move for judgment notwithstanding the verdict ("j.n.o.v.") pursuant to Fed.R.Civ.P. 50(b) to set aside the jury's cumulative award of $3 million in damages under the New Jersey Wrongful Death Act to plaintiffs William Rosario, Stephen Rosario, Esteban Rosario, Jr., and Joanne Rosario Lorenzi (collectively the "Plaintiffs"), children of the decedent, Esteban Rosario.

The parties appeared at trial earlier this year on Plaintiffs' claims that the Defendants, all police officers with the City of Union City Police Department, failed to provide adequate medical care to their father, Esteban Rosario, after he was placed under arrest on October 27, 1999, causing his death. During the course of the trial, the Court had the occasion to remind the parties, outside the presence of the jury, that under New Jersey's wrongful death law, damages to compensate for the emotional loss suffered by the decedent's family were unavailable. Rather, the law provides—as discussed at greater length later—only those damages for the pecuniary value of the lost advice, counsel, and guidance are available. In presenting evidence on damages, Plaintiffs' counsel called to the stand plaintiffs Stephen Rosario, William Rosario and Joanne Rosario Lorenzi, each of whom described his or her relationship with his or her father. Esteban Rosario, Jr. is mentally disadvantaged and institutionalized. Testimony as to his relationship with his father was offered by several of

his siblings. No expert testimony relating to damages was offered.

The jury was instructed as to the limitations on damages for the wrongful death claim[1]. After deliberations, the jury returned a cumulative verdict of $3 million to the plaintiffs on their wrongful death claim (the jury also awarded $2.5 million to Esteban Rosario's estate for his pain and suffering endured before his death, damages that are not now at issue). The verdict was as follows: $500,000 each for

1. The jury instructions read, in relevant part:

Second, Plaintiffs seek damages under New Jersey's wrongful death statute. As I told you, under this law, Plaintiffs bring a suit as the representatives of the survivors of the decedent and seek to recover damages from the Defendants contending that Defendants' fault was responsible for the death of decedent. The money damages sought on behalf of the survivors of the decedent represent the actual pecuniary or financial loss which Plaintiffs contend has been and will in the future be suffered by the survivors due to the death of the decedent.

This claim for pecuniary or financial loss is distinguished from any physical injuries or suffering that may have been sustained by the decedent, such as any pain and suffering or disability sustained by the decedent.

In the event that you find in favor of the Plaintiffs, that is, that the Defendants are liable under the standards articulated above, which liability was a proximate cause of decedent's death, you must limit your consideration to whatever financial loss was suffered by the survivors as measured by what they would have received from the decedent within a reasonable degree of probability if the decedent had survived. I instruct you that the pecuniary injuries or money losses in this case should not include emotional distress, anguish, grief and sorrow or loss of emotional satisfaction derived from the society and companionship of the decedent. These matters, though real and very distressing, cannot be considered in determining the extent of the financial or pecuniary loss suffered by the survivors who are represented in this action by the Plaintiffs.

The financial loss does include, however, not only actual monies which would have been contributed to or earned for the benefit of the survivors, but it also includes the reasonable value of benefits which would have been received in the nature of services, assistance and care as well as training, guidance and counsel that the decedent's survivors would have received had the decedent lived.

To determine the amount of damages to be awarded, i.e. the extent of the financial loss caused by the premature death of the decedent, all circumstances and probabilities which bear upon that financial loss may be considered.

You may consider the benefit given by the decedent to a survivor or survivors in the form of services or assistance rendered by the decedent and in guidance and training which may have been offered by the decedent to the survivors. You must determine the reasonable value to be placed on the services or benefits that will be lost by reason of the death of the decedent. In other words, the loss of the decedent's guidance, advice and counsel to the survivors is likewise to be confined to its pecuniary element. It is not the loss simply of the exchange of views, no matter how perceptive, when the child and parent (or other survivor, where appropriate) are together; it is certainly not the loss of pleasure which accompanies such an exchange. Rather, it is the loss of guidance, advice and counsel which all of us need from time to time in particular situations, for specific purposes, perhaps as an aid in making a business decision, or a decision affecting one's life generally, or even advice and counsel needed to relieve depression or a personal dilemma. It must be the kind of advice and guidance that could be purchased from a business advisor, a therapist, or a trained counselor, for example.

Now, taking the foregoing principles into consideration, it is up to you, the jury, to decide what services the decedent would have rendered to the survivors, and what the value of these services is. In doing so, remember that there need be no proof that the survivors will probably purchase such companionship and advice; it is sufficient that the deceased would have rendered them if he had lived.

In considering those various factors, and in ascertaining the probabilities of pecuniary loss, you should also consider the decedent's personality and character, his habits and customs and the relationship that existed between the decedent and the survivors.

Stephen Rosario and Esteban Rosario, and $1 million each for Joanne Rosario Lorenzi and Esteban Rosario, Jr. With this motion, Defendants challenge that verdict on the ground that the evidence of Plaintiffs did not prove the pecuniary value of any lost advice, counsel, and guidance.

As an initial matter, the Court finds that Defendants have not waived the arguments advanced on this motion. Although Plaintiffs' counsel argued in its papers that the Defendants waived their right to make a j.n.o.v. motion by failing to object at trial, counsel did not raise the point at oral argument, perhaps realizing the weakness of the position. At any rate, counsel for Defendants raised the issue of the appropriate measure of damages under the wrongful death action on several occasions, and the issue was the subject of numerous discussions between the parties and the Court. Indeed, defense counsel made motions for directed verdict both at the close of Plaintiffs' case and before closing arguments. In short, there is no basis for concluding that Defendants waived their right to bring this motion.

■ Turning to the merits, the Court's inquiry must begin with the damages provisions of the Wrongful Death Act, N.J.S.A. 2A:31–5:

> In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.

The seminal interpretation of the statute is *Green v. Bittner*, 85 N.J. 1, 424 A.2d 210 (1980). There, the New Jersey Supreme Court made clear that under the statute, damages were limited to the pecuniary value of the loss, including loss of companionship, advice, and counsel. 85 N.J. at 12, 424 A.2d at 215.[2] "Companionship and advice in this context must be limited strictly to their pecuniary element. The command of the statute is too clear to allow compensation, directly or indirectly, for emotional loss. Our cases uniformly so hold. (Citations omitted.) Companionship, lost by death, to be compensable must be that which would have provided services substantially equivalent to those provided by the 'companions' often hired today by the aged or infirm, or substantially equivalent to services provided by nurses or practical nurses. And its value must be confined to what the marketplace would pay a stranger with similar qualifications for performing such services." *Id.*, 85 N.J. at 12, 424 A.2d at 215. Similarly, the Court observed:

> The loss of guidance, advice and counsel is similarly to be confined to its pecuniary element. It is not the loss simply of the exchange of views, no matter how perceptive, when child and parent are together; it is certainly not the loss of the pleasure which accompanies such an exchange. Rather it is the loss of that kind of guidance, advice and counsel which all of us need form time to time in particular situations, for specific purposes, perhaps as an aid in making a business decision, or a decision affecting our lives generally, or even advice and guidance needed to relieve us from unremitting depression. It must be the kind of advice, guidance or counsel that could be purchased from a business advisor, a therapist, or a trained counselor, for instance. That some of us obtain the same benefit without charge from spous-

---

**2.** The *Bittner* case arose from the death of a child, rather than from the death of a parent, but the limitations on damages it described apply to both types of cases.

es, friends or children does not strip it of pecuniary value.

85 N.J. at 14, 424 A.2d at 217.

 This Court now must determine whether Plaintiffs presented sufficient evidence to support the $3 million award under *Bittner*. Other courts, in similar circumstances, have evaluated the quality of the evidence to see if it afforded a jury the opportunity to arrive at a rational damages amount without undue speculation. As example, in *Brown v. Kennedy Memorial Hospital–University Medical Center,* 312 N.J.Super. 579, 711 A.2d 1370 (App.Div. 1998), the New Jersey Appellate Division affirmed the trial judge's ruling that the evidence presented on damages did not support jury awards of $400,000 for loss of housekeeping and clerical services, and $425,000 for loss of counseling services and funeral expenses. Citing the *Bittner* rule, the Court noted regarding the award for loss of housekeeping and clerical services, "Plaintiff presented no evidence of either the value of the housekeeping and clerical services, or the counterbalancing value of the decedent's living expenses. Here, it would have been feasible to present evidence of present economic value of the kinds of services Jeanette provided. Damages replace services that could otherwise be bought, and that the decedent would have likely provided had she lived." *Id.,* 312 N.J.Super. at 594, 711 A.2d at 1377. That Court further observed, "The jury was futilely without guidance concerning both the value of the household services the decedent had been providing and the value of the services plaintiff was providing her. A jury is not authorized to base a decision on conjecture or speculation. Jurors were required to estimate the time period in which plaintiff would continue to require such clerical and household services; but that estimate could not have been long, as plaintiff was age 86 as of the date of trial." *Id.*

The Appellate Division also confirmed the striking of the award for lost companionship by the trial judge because of the lack of sufficient evidence, the duplication of these damages with the award for lost services, and a determination that the verdict was the result of sympathy and passion. The Appellate Division wrote:

Although there was evidence presented that Jeannette was a supportive companion to plaintiff after his wife's death, plaintiff offered no evidence to equate Jeannette's companionship to the cost of providing similar companionship, counsel or guidance from a paid helper. Although *Green v. Bittner* instructs that expert testimony is not necessary to place a value on prospective services of a minor child, it is clear that the Supreme Court cautioned that expert testimony is helpful to avoid leaving the jury to conjecture on valuation. Here, we are valuing the services of an adult. Quantification was feasible through expert testimony. The jury should not have been left to conjecture on this matter.

*Id.,* 312 N.J.Super. at 595, 711 A.2d at 1378 (citations omitted).

Unlike here, the plaintiff in *Morris v. Krauszer's Food Stores, Inc.,* 300 N.J.Super. 529, 693 A.2d 510 (App.Div.1997) presented the testimony of an expert, who calculated the loss of the decedent's services to her children, including the cost of paying someone to cook, clean, shop, and launder, and the loss of guidance, instruction and training, at $45 an hour until the time the youngest child was "emancipated." The total damages calculation by the expert was $677,500. The jury, however, awarded $1.5 million for loss of services. The Appellate Division allowed the verdict to stand, finding that "the jury was entitled on this record to find that the expert was conservative in calculating the loss of

such intangible services as guidance, training and counseling for so many children," and holding that the award did not "shock our judicial conscience." *Id.*, 300 N.J.Super. at 543, 693 A.2d at 517.

In *Schiavo v. Owens–Corning Fiberglas Corp.*, 282 N.J.Super. 362, 660 A.2d 515 (App.Div.1995), the decedent had been disabled in 1975 as a result of a car accident which injured his back; the last operation necessitated by the accident caused severe nerve damage leaving him incontinent. Decedent married his wife in 1986, after his complete disability but before his mesothelioma diagnosis. His physical activities were limited, but he and his wife took walks together and engaged in some "slight" recreational activities, though they mostly stayed home together. The jury awarded $150,000 for the pecuniary losses resulting from his death. The Appellate Court affirmed, observing: "Mrs. Shiavo testified that her husband helped her with problems to the best of his ability and that he had a 17.88 year presumptive life expectancy. The jury, of course, could have rejected this expectancy because of decedent's unrelated poor health. A $150,000 award for the pecuniary loss involved in 17.88 years or even some appreciably lesser time span of companionship, guidance, advice and counsel does not constitute a miscarriage of justice." *Id.*, 282 N.J.Super. at 370, 660 A.2d at 519.

The Appellate Division upheld an award of $436,000 in *Goss v. American Cyanamid Co.*, 278 N.J.Super. 227, 650 A.2d 1001 (App.Div.1994), a wrongful death action involving the 1991 death of a 67–year–old worker from asbestos exposure. The Appellate Division upheld the award based on the following evidence:

Patullo died at the age of 67 with a remaining life expectance of 15.20 years. The evidence established that he and Mrs. Patullo had been married for forty-three years and enjoyed a very close marital relationship. Before Patullo's illness, they had an active social life, and were very close to their children and grandchildren. Patullo had Paget's disease, but he was able to walk, golf and exercise. After he contracted the cancer, he was unable to engage in these activities. Patullo was forced to leave work before he was diagnosed with asbestosis because of his Paget's disease, and spent his time thereafter helping around the house, including preparing dinner when Mrs. Patullo worked part-time. Patullo drove Mrs. Patullo everywhere because she did not drive. After Mrs. Patullo underwent two serious operations, Patullo cared for her. After the onset of Patullo's asbestos related illness, Mrs. Patullo had to do everything around the house herself and had to care for Patullo as well. According to Mrs. Patullo, after Patullo became ill, they never returned to a normal lifestyle.

Mrs. Patullo testified that Patullo provided her with emotional support. When asked, Mrs. Patullo did not specifically describe this emotional support, but testified that Patullo cared for her after she had two serious operations. Patullo used to help her prepare the meals, take her grocery shopping, run errands and help around the house. Additionally, Patullo managed the family finances. When Patullo died, Mrs. Patullo lost all of Patullo's services, companionship, guidance, advice and counsel, all of which had significant pecuniary value.

*Id.*, 278 N.J.Super. at 244–45, 650 A.2d at 1009–10.

The Appellate Division, in upholding the award, noted that it "may have been on the high side of the legitimate range of damages." *Id.*, 278 N.J.Super. at 245, 650 A.2d at 1010. Nevertheless, the Court concluded, "Reasonable minds could accept the evidence at trial as adequate to support the jury's award for Patullo's wrong-

ful death. In sum, there is no clear and convincing proof of a miscarriage of justice and we certainly do not perceive the sense of 'wrongness' that is necessary to overturn the damage awards in these consolidated matters." *Id.* (citations omitted)

Finally, *Tirrell v. Navistar Int'l, Inc.*, 248 N.J.Super. 390, 591 A.2d 643 (App.Div. 1991) dealt with the death of a 28–year old worker who earned $35,000 a year as an oiler. The jury awarded $2.5 million on the wrongful death action and $50,000 for decedent's pain and suffering.

Plaintiff presented the following evidence on damages:

Plaintiff had testified in detail concerning the work decedent did at home and the time he spent with her and their four children, ages one, nearly four, six and seven years old at the time of their father's death. [Plaintiff's economic expert] factored into the loss equation the time a spouse normally spends working in the house (ten hours per week), even though he acknowledged that this was less than the time decedent normally worked at his house. After deducting what decedent would have paid for his personal expenses, the expert testified that there had been a net earned income loss of $104,000 to the time of trial and a loss of physical household services of $15,865 (then reduced by three percent for sickness). This estimate contained no pecuniary value for the loss of companionship, guidance or advice.

*Id.*, 248 N.J.Super. at 396–97, 591 A.2d at 646 (citations omitted).

On appeal, defendant sought to have the award overturned on the grounds that plaintiffs' expert testified that the family's net pecuniary loss as of the time of trial

was $104,000, and that the most the jury therefore could have awarded for the remainder of decedent's working life was $1.6 million. The Appellate Division upheld the award: "[C]onsidering the work decedent did around the house and the damages for advice and companionship permitted by [*Bittner*], the $900,000 additional award, even if split equally among the widow and four children, would yield but $180,000 for a lifetime's loss of husband or father. If the jury accepted the fact that decedent would be promoted and potentially would be earning between $65,000 and $80,000 per year, the additional damages become insignificant." *Id.*, 248 N.J.Super. at 408, 591 A.2d at 652.

Drawing lessons from these opinions, some which upheld awards and some which struck them, is not easy. But in each case, the jury was presented with at least some guidance for their damages determination. In some cases, it was expert evidence of the market value for the services provided by the decedent. In others, it was evidence describing with specificity the type of advice, services, and companionship provided by the decedent. And in each case, the jury was given evidence of the life expectancy of the decedent at the time of his or her death.

Turning to the evidence offered here, it is significant to note what is missing. No expert evidence was offered, despite the Court's February 6, 2003 caution to Plaintiffs' counsel that while expert testimony was not legally required, it was for practical purposes essential in providing sufficient evidence for a jury to make a rational determination. Even more troubling, the jury was given no evidence about Esteban Rosario's life expectancy.[3] Such evidence

---

**3.** Plaintiffs' counsel attempted to elicit such testimony from Plaintiffs' medical expert, but the Court sustained Defendants' objections and ruled that the testimony was inadmissible as outside the expert's area of expertise, pa-

thology. The Court added, however, that it would take notice of any actuarial tables indicating the decedent's life expectancy that

allows a jury to determine, if it wishes, the pecuniary value of advice, guidance, and counsel by assessing the annual or monthly value of such services and projecting that amount by the number of years or months that the decedent might live.

Plaintiffs' counsel called as witnesses Stephen Rosario, William Rosario, and Joanne Rosario Lorenzi. At oral argument on this motion, the Court read each witness's testimony that arguably went to the damages issue. Both sides agreed that the evidential excerpts read by the Court were complete in that they included all relevant, material portions of the witness's testimony.

*William Rosario's* testimony was:

Q: What are your earliest memories of your dad?

A: Well, my earliest memory of my dad, I remember him bringing us racing cars that took up the whole apartment. And I remember we used to have to get permission to put it together because it was so big. And my brother and I played with that for hours. And then actually he was everything to me. We happened to look alike and he was like my best friend.

\* \* \*

Q: How old were you when you found out you looked like your father?

A: I always felt I looked in the mirror when I spoke to my father. And I always looked to him. And my kids and my wife always said we looked alike and my mannerisms are like his. I wish I was like him. He was well-liked. He was very understanding. Like I said, he was my world. I miss his laughter. I miss my dad.

Plaintiffs' counsel wished to submit to the

\* \* \*

Q: How did you feel at that point learning that your father had died?

A: My best friend dying. That day my world fell apart.

Q: Why?

A: I lost my companion. Somebody I spoke to who gave me advice. Somebody who I would get advice to deal with my kids. And my whole world just crumbled under me.

\* \* \*

Q: As you grew up, how did your relationship with your father develop? Did it change at all?

A: Well, yeah, it changed as I got older because I couldn't make it to see him as often as I liked. But we spoke a lot on the phone. If I had a problem, I would call him. If I was going on long trips, I would take him with me for two reasons, actually, because I wanted him to drive because he knew how to get everywhere, and second just to be with him. Just to talk with him. Hear him smile, hear him talk, for the company.

\* \* \*

Q: Was that often that you would get together like we see in that photograph?

A: Well, not as often as I would like. Again I moved upstate and with my own kids, you know, my job, my kids and my kids keep me active. So not as often as I would like, but we spoke a lot.

Q: When you spoke, what would you speak about?

Court. No submission was made.

A: Everything. I mean if I had a problem, we spoke about that. If I didn't have a problem, I just wanted to hear his voice.

Q: What kind of problems would you bring to your father?

A: Well, if my kids did something I didn't understand or if my wife and I had a quarrel and I wanted an opinion from somebody who meant something, I would call my dad.

Q: Why?

A: Because if it had to be with my wife, it was personal.

Q: But why would you call your dad for advice?

A: Because he always gave me good advice. He always gave me the right—I always felt he gave me the right answers to all my questions.

Q: Was that meaningful to you?

A: Very meaningful to me. I respected him for that. I respected him for that. And I know the advice he gave me, he never steered me wrong.

Q: Did it assist you in living your life?

A: He sure did.

Q: How?

A: He helped me deal with my marriage. I'm married twenty years. A lot of things happen in twenty years. He helped me deal with that. He helped me deal with situations with my boys. And I felt him, better than anybody, he had three of his own, if I was going to take advice from somebody, I had to take advice from somebody who meant something to me, somebody who had some kind of structure in my life.

\* \* \*

Q: You have an opportunity, under the laws of the United States, to present and tell the jury what you have lost in terms of the death of your father. I'm now going to provide you the opportunity to tell this jury what you have lost as a result of the death of your father.

A: I lost my best friend. I lost somebody who I loved dearly and I know loved me unconditionally. His companion, his laughter, his voice. I lost all of that. I lost, my kids lost their grandfather. Somebody who I wanted them to be a part of because they deserve to know their grandfather. He was a good man. My father was somebody you look up to. He was worth knowing. If you knew my dad you would know my father was worth knowing. Always full of life. Always full of life and love he shared with everybody.

Q: Was there ever a day that goes by since he's gone that you don't miss him?

A: No. I have a picture on my dresser today. I wake up to that picture, my sister, actually her and my father are standing in that picture. And every morning I wake up I look at it because I never want to forget my father.

Q: Why is it that every morning you wake up you want to look at it?

A: Because I loved him and I will never have the opportunity to talk to him or to hear his voice or to hear him laugh. All I got is my sister and my brothers. That's all I will ever have from my dad again. My kids will never benefit from knowing such a good person like my father and the love that he shared with everybody and the laughter he brought. When he walked into a room, all he did was laugh. He would bring laughter with him and

felt like he would walk into the room and the whole room would start laughing and joking around.

Q: Was that important to you for your life?

A: Yes

Q: I realize that other people who didn't know your father might never understand the importance to you in your life, but was that important in your life?

A: That was, it was very important in my life. It was, actually I want, I need a second. It's important to me because my father was, like I said, my best friend. My father is very understanding and he loved me and he made me feel like he loved me. And it's funny because I said he made me, that he made me feel like I was the only one and I know I shared him with everybody. But to me he was my world. It was like looking into the mirror and saying I want to be like him. If I can be half the man he was, I would be all right. If I was half the man my father was, it would be all right.

Q: Is it good to have a father like [that] to set an example for you?

A: Yes. The way my father is or was, I would like to be like that with my own children so that they can appreciate me the way I appreciated my father because I miss him dearly.

*Joanne Rosario Lorenzi* said:

Q: After your brother had to go to an institution, what could you observe in terms of your father's continued caring for his, your brother?

A: We used to go, we used to go see him all the time. I remember when I was younger we used to go a lot of times to see him, me and my mom and my dad. And then over the years my brother started coming and my brothers would come over also and we would just go with the kids and we just all had a good time. There's a big park. You just go there. You are not limited there. You bring the whole family, you take them to—he doesn't stay still so you have to be with him all over the place. He likes to be on the rides. My father, there was this special swing they had that you push with your legs. We would sit there and my father and my mother also and we just stayed with him. He would love it. He used to love being on the swings down there.

Q: What is it? Could you tell us that even though a child is profoundly restricted in terms of ability, what could you observe about your father that would provoke him or urge him to continue to want to be with a son that has such severe disabilities?

A: I don't know. I just know that my father used to get so emotional when we would get there and my father was the one that always wanted to push him with the wheelchair and that was his time. It was my father's time there. When we would go visit him, that was the time they spent together mostly. Even if I was running around all over the place and my mom would be there also, they used to just stay with him there and just hug him and I would see them all the time just....

\* \* \*

Q: What do you remember about your early days with your father?

A: With me?

Q: Yes.

A: Me and my father were very close. He used to take me everywhere

with him. I was daddy's little girl. It didn't matter where I went. I would go with him to the wrestling or we just went to New York to go to the movies. He would take me a lot to New York on the weekends to see karate movies.

Q: How often would you get together with your brothers?

A: Well, I know they used to, when I was younger, they used to come over the weekend and we used to go out a lot. My father was just, we used to go a lot to Chinatown to eat. My father used to, like there was a specific restaurant in Chinatown and he would always take us there to eat that I remember or either we would just watch movies at the house. My father was always on the road. He was always out. He used to like to go out a lot. He just said let's go and that was it. There was no questions asked, we were just going.

\* \* \*

Q: Could you tell the Court and the jury about your relationship with your dad in terms of the companionship that he provided to you?

A: My father was very loving with me. And like I said, he was the only thing I had left. I saw my father almost every day. We were always together. It didn't matter if we went shopping. It didn't matter if I went with him to the doctors or I would just go around and visit him and he would stay in that yard. We spent many good times in that backyard.

Q: When you say you spent virtually every day together, how would that come about?

A: Because my father lived in Union City and from Jersey City where I lived it was a walking distance. So I always, I was always at my father's house. And if for any reason I wouldn't be able to go, I would call him. Me and my father, we always spoke a lot over the phone.

\* \* \*

Q: What did you experience with your father in terms of that? Was this an every day occurrence? What would you do?

A: Yes, it didn't matter if either we went out, like I said, or I would just go over and visit him. We would watch t.v. or we would go to the backyard. My father was always doing some kind of construction stuff and he had made this little house in the yard and he had tables there. We would just sit there and he would cook and we would hear old music.

[At this point, the Court interrupted the examination and excused the witness, saying: "I am not, at this point, prepared to say that what counsel for the plaintiff has been doing so far, it has recalled this witness, is appropriate for determination of loss of companionship damages."]

*Stephen Rosario* testified:

Q: Could you tell the members of the jury and the Court whether that was important to you growing up, having a relationship with your father? Because I realize today many people come from broken homes. But was it important to have a relationship with your father?

A: Yeah, it is, knowing who your father is, where you come from, what's your background, it's all part of knowing him. Nowadays parents are divorced, people don't see the

kids. My dada was always there regardless whether he lived in Brooklyn, Queens, New Jersey, you know, he sought us out, took us for the weekends, very spontaneous.

If we were hungry for Chinese, although we were in Hoboken, Brooklyn, straight to Chinatown. The same restaurant is still there to this day, 69 Chinese Restaurant at 69 Bayott Street (phn), ugly orange painting with pictures all over the place. If we had an urge for Spanish food, there was a cuchifrito stand. It's the Spanish way of fried foods, fried bananas and stuff like that. He went, he would take us up to Spanish Harlem, Second Avenue about 106th Street. If it was Italian, he always had a different place but it was always at the spur of the moment. If we wanted to go, depending on the food, that's where we went.

Q: By the way, as you grew older, were you able to reflect on your relationship with your father? In other words, did it become less or more important to you as you got older?

A: I think it gets more important when you get older.

Q: Why?

A: I was able to talk to him differently than my stepfather or anybody else. He was never quick to make a decision on anybody. He guided me through my first marriage, a half a million girlfriends, through school, through my kids. Even when I would fight with my brother over stupid things and you go over to him, he was still the referee no matter what.

\* \* \*

Q: By the way, was your dad sick? How often did you and your dad speak to one another?

A: We spoke every couple of weeks. . . .

\* \* \*

Q: You referred to him as the referee. What did you mean by that?

A: Well, as we all know he started early as being one of the first Hispanics to be licensed to be a ref. So we always had him judge any arguments we had. We have had tons of pictures of him with wrestlers that we have always known. We grew up with pictures like Tony Garcia, Chief J. Strongbow, Agent Moralis, all the old wrestlers. He was always there. If we had an argument, he was the one who sorted it out, told you where you screwed up, how you do it better, what to do. He gave us all the guidance and put us where we had to be, made sure we did the right thing.

Q: One of the people we can't hear from is your brother, his son Esteban Jr. Tell us a little bit about what you could observe in terms of that relationship.

A: Esteban, Jr. Is profoundly retarded. He is a baby in a man's body. When we go visit, he has a habit of hitting himself. But, when I go with my dad, the kid was calm. He recognized who his parents were. When we would take him out to the park, the facility there has a big property. They have swings. With my dad he would walk, you know, it wasn't a struggle to get him on the swing. He was calm. If I did it, he gave me a hassle. I mean to him I was always a stranger. With my dad around it was a noticeable dif-

ference on how he reacted. He didn't hit himself. It's like you're just picking up your toddler, that kind of reaction, where he would recognize who was there and who wasn't.

Q: In terms of growing up with your father and the type of guidance and advice he gave you, was that meaningful to you and if so why?

A: Very meaningful. It made me, I believe, the person that I am now. You know, with all the stuff that happens in the world, kids always go sideways. He kept us pretty well straight. I keep, I try to be fair and listen to everything that everybody has to say. I try not to rush to judgment, which is hard. He gave me that sense of humor and that sense of life to have fun and joke with everybody. You know life is too short. You've got to enjoy it every day, and he did that.

Q: You told us one of the things he involved himself in terms of guidance as you grew up was your girlfriends and eventually your wife. What did you mean by that?

A: Well, before my present wife Sonya, he always teased my ex-wife Lily. My ex-wife is Chinese. Every time he saw here, he would call her Chineta (phn) Chinese in Spanish. Always bugged her about having pork fried rice. When we split up, he helped me go through this. Then I met Sonya and we started going together. He embraced her just like another daughter, made her happy. They goofed. He teased her all the time. He always made it look like if I wasn't home within ten minutes from work I was probably out finding another girlfriend, which thank God is not true.

* * *

Q: I'm now going to give you an opportunity, under the United States laws, to describe to the Court and jury what you have lost as a result of your father's death. Would you please do so?

A: I lost half of myself. Since all of this has happened in the last couple of years, I have noticed I have put myself a little distant. I stand more alone sometimes. I lost a big part, a big part of my mind and my heart. Hopefully you know time will heal everything. Time can't heal this. The sense of loss and the way of the loss to me is the most burdensome.

Q: What do you mean half of yourself?

A: He helped, I figured he helped mold me to the person and the personality I am. He guided me through everything, told me a lot of stuff, and I want to live by what he has taught me. And I hope I live up to that. But to lose him it was like somebody just went in and ripped my heart out and that's something I don't' know how I'm going to come back from.

Reviewing this testimony, it is clear that there was no meaningful demonstration to the jury members about how they might appropriately measure the pecuniary value of the services, advice, and counsel provided to any of the children Plaintiffs by decedent. The testimony given by the Plaintiffs, read as a whole, reveals that the decedent was a warm, loving person, whose company the Plaintiffs cherished, and whom the Plaintiffs miss very much. The Court neither disputes the sincerity of Plaintiffs' testimony nor disregards the significance of their loss. But, under the statute as written and interpreted, damages in a wrongful death action are limited

to the *pecuniary value* of the advice, counsel, and guidance provided by the decedent. Almost none of the testimony provided by Plaintiffs provide the jury with evidence going toward the kinds of advice and counsel provided by decedent; what scant evidence of such advice and counsel was not accompanied by any basis of cost of comparable advice purchasable on the market. Also, the jury was given no basis of the length of time that Plaintiffs could have expected to enjoy that advice and counsel because no evidence of the decedent's life expectancy was advanced. The award of $3 million for such compensatory damages could only have been the result of pure speculation by the jury. Because a significant monetary award based on nothing but the jury's speculation necessarily shocks the judicial conscience, the award cannot stand.

The Defendants' motion is granted, and the jury's cumulative award of $3 million in compensatory damages to the decedent's children on Plaintiffs' wrongful death action is vacated. The $2.5 million jury award to the estate is not disturbed by this motion.